IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MON RIVER TOWING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1499 |
| | ) | Judge Nora Barry Fischer |
| INDUSTRY TERMINAL AND | ) | |
| SALVAGE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

This matter involves a claim by Plaintiff Mon River Towing (hereinafter "Plaintiff" or "Mon River") that Defendant Industrial Terminal and Salvage Company ("Defendant" or "Industry") negligently allowed Plaintiff's new barges, which were docked at Defendant's fleeting facility, to break free causing damage to the barges. A five day non-jury trial was conducted on July 27-31, 2009 before the undersigned Judge. (Transcripts at Doc. Nos. 110-14). After the trial, the parties submitted proposed findings of fact and conclusions of law. (Doc. Nos. 121-22). Subsequently, the Court appointed Thomas Claassen, C.P.A.[1] as a Special Master to analyze the question of lost profits damages. (Doc. No. 132). His December 30, 2009 memorandum report to the Court and counsel is attached as an Appendix to this opinion ("Appendix"). Upon consideration of the trial record, the

---

[1] Mr. Claassen is a Certified Public Accountant with the firm of Schneider Downs & Co. in Pittsburgh, Pennsylvania. He is an accredited business valuator, certified fraud examiner, and is certified in financial forensics.

parties' submissions, and the Special Master's Report, and based on the following findings of fact and conclusions of law, judgment will be entered in favor of Plaintiff Mon River and against Defendant Industry.  Damages will be awarded for out of pocket expenses, lost profits, and attorneys' fees.

## II.  PROCEDURAL BACKGROUND

On November 9, 2006, Plaintiff commenced the instant action by filing a complaint with four counts: (1) alleging negligence, (2) seeking lost profits damages based on loss of use, (3) seeking indemnification for any third party claims resulting from the incident, and (4) seeking prejudgment interest and attorneys' fees based on Defendant's alleged bad faith.  (Doc. No. 1).  After discovery was complete, the Court entertained cross-motions for summary judgment (Doc. Nos. 33-34).  On March 31, 2009, this Court denied Plaintiff's Motion for Partial Summary Judgment and granted Defendant's Motion for Summary Judgment as to count 3, seeking indemnification, and denied it in all other respects.  (Doc. Nos. 58, 59).

The Court held a bench trial on the remaining claims and issues from July 27 through July 31, 2009.  (Transcripts at Doc. Nos. 110-114)[2].  In preparation, the Court heard Defendant's numerous Motions in Limine to exclude evidence.  (Doc. Nos. 62, 64, 66, 68, 70).  The Court later ruled on said motions.  (Doc. Nos. 81, 83, 84, 85).  The parties filed a joint Pretrial Stipulation of Facts.  (Doc. No. 80).  On June 9, 2009, the Court held a Settlement Conference, but the case did not settle.  (Doc. No. 82).   In advance of trial, the depositions of multiple witnesses (Richard Bacsi,

---

[2]

Trial was initially scheduled for June 23, 2009, but was subsequently rescheduled for July 28, 2009 on Defendant's Motion to Continue Trial Date.  (Doc. No. 86).  It was later rescheduled again, to begin July 27, 2009.  (Doc. No. 89).

Larry Barbish, Mark Fletcher, Myron McDonough, Cary Keith Kyle, and Richard Davis) were made part of the trial record.  (Doc. Nos. 96-100, 103).

At trial, Plaintiff called James Guttman, Robert Barra, and William Seiler; Defendant called Lynn Busatto, Anthony Bartley, Kevin Moran, and Thomas Kula.  (Doc. No. 104).  Joint Exhibits J-1 to J-10 were admitted.  (Doc. No. 105).  Plaintiff's Exhibits P-1 to P-19 and P-21 to P-29 and Defendant's exhibits D-1 to D-19, D-21 to D-25, D-27, D-33 to D-36, and D-39 to D-54 were also admitted.  (*Id.*).  Finally, Court Exhibit 1 was admitted.  (*Id.*).  At the close of Plaintiff's case, on July 29, 2009, Plaintiff and Defendant both moved for directed verdicts on the issue of liability, and Plaintiff also moved for a directed verdict on damages.  The Court denied Defendant's motion on July 30, 2009.  At the close of Defendant's case, Plaintiff orally renewed its Motion for Directed Verdict on the issues of liability, damages, and bad faith; Defendant orally renewed its Motion for Directed Verdict on the issues of liability, damages, failure to mitigate, and bad faith.  (Doc. No. 104).  The Court took the motions under advisement.

After the trial, two more witness depositions (Doug Bielski and Richard Ehringer) were made a part of the record.  (Doc. Nos. 106-07). Plaintiff filed its Post Trial Brief on August 20, 2009, and Defendant filed its Post Trial Brief and a response to Plaintiff's brief  on September 4, 2009.  (Doc. Nos. 109, 115, 116).  With leave of Court, Plaintiff filed a Sur-Reply Brief on September 22, 2009. (Doc. No. 119).  On October 19, 2009, the parties submitted their Proposed Findings of Fact and Conclusions of Law.  (Doc. Nos. 121-22).  On November 3, 2009, they submitted their Responses thereto.  (Doc. Nos. 127-28).

Meanwhile, on September 30, 2009 the Court convened a telephone status conference during which it advised the parties of its preliminary findings on liability and bad faith, and suggested

appointing a Special Master on the issue of lost profits.  (Doc. No. 120).  The Court subsequently held three telephone status conferences between October 21 and October 30, 2009, to discuss appointing a Special Master and the possibility of a return to mediation, at the conclusion of which it was agreed that Thomas Claassen, CPA would serve as a Special Master and the Honorable Kenneth Benson would serve as a mediator.[3]  (Doc. Nos. 124-26).  The Court subsequently held another telephone status conference and heard argument regarding which materials should be submitted to the Special Master for his review, and the Court then ruled on same in a Memorandum Order dated November 11, 2009.  (Doc. Nos. 128-29).  On November 16, 2009, the Court entered an order referring the case to Mr. Claassen as Special Master on lost profits.  (Doc. No. 132).  On November 30, 2009, a hearing on damages was held during which counsel for the parties presented their arguments to the Special Master in the presence of the Court.  (Doc. Nos. 133, 136).

Subsequently, the Court issued a Memorandum Opinion on the calculation of lost profits damages, to assist the Special Master.  (Doc. No. 134).  The Special Master then submitted his Report to the Court and the parties on December 30, 2009.  Plaintiff filed its Objections to the Findings of the Special Master on January 13, 2010, and Defendant filed its Response thereto on January 29, 2010.  (Doc. Nos. 137, 139).

As the issues have been presented at trial, extensively briefed, and presented at substantial post trial proceedings, and as multiple attempts at mediation and settlement have failed, the Court now issues the following opinion and judgment.

---

[3]

A mediation session with the Honorable Kenneth Benson was eventually held on January 20, 2010, after the parties had received and responded to the Special Master's Report, but the case was not resolved.  (Doc. No. 138).

### III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  FED.R.CIV.P. 52.

### A.      PARTIES

Plaintiff Mon River Towing is in the business of moving bulk commodities by barge on the inland river system,[4] mainly on the Monongahela, Allegheny, and Ohio rivers within 200 miles of Pittsburgh, Pennsylvania.  (Doc. No. 113 at 24).

At all relevant times during 2004, the following individuals were principals and employees of Plaintiff Mon River Towing.  James Guttman was President of Mon River, until January 2006. (Doc. Nos. 113 at 24; 114 at 14-15).  Richard Ehringer was the General Manager.  (Doc. No. 107, 3-5).  William Seiler was the Controller, and reported to Mr. Guttman.  (Doc. No. 114 at 125, 148). Robert Barra was Mon River's Sales Representative.  (Doc. No. 114 at 91, 107).  Cary Keith Kyle was Vice President of Transportation, responsible for scheduling Mon River's vessel loading and movements.  (Doc. No. 100, 4-5).

Defendant Industry Terminal & Salvage Co. operates a landing or terminal at Mile 33.5 on the Ohio River, approximately two miles downstream from the Montgomery Lock and Dam.  (Doc. No. 111 at 16).  At Mile 34 on the Ohio River, approximately 300 feet downriver from the lower end of the Industry Terminal is Shell Dock, a facility for docking barges, also operated by Industry.  (*Id.* at 16-17).

---

[4]

The "inland river system" or the "inland waterways" refer to the Mississippi River and its system of tributaries as well as other navigable waterways within the continental United States, upon which cargo is transported by barge.

At the time of the breakaway, Lynn Busatto was President of Industry. (Doc. No. 110 at 4). Anthony Bartley was an employee of Industry, and the pilot of Industry's towboat the M/V Ranger. (Doc. No. 111 at 14-15).

After the incident, other individuals became involved. Both parties hired marine surveyors to examine the damage to the barges. Plaintiff hired Richard Davis, a marine surveyor and owner of Davis Marine Surveyors; and Defendant hired Kevin Moran, a marine surveyor for Merrill Marine Services. (Doc Nos. 113 at 94; 111 at 98-100; Exh. J-5). Thomas Kula, senior marine claims manager for Industry's insurer, International Marine Underwriters, managed the claim adjustment and participated in much of the negotiation and litigation that followed, including corresponding with representatives from Mon River and with Industry's Surveyor, Mr. Moran. (Doc. No. 111 at 152-54).

## B.   LIABILITY

### 1.   Findings of Fact

In May 2004, Plaintiff chartered 13 new jumbo barges[5] (numbered MRT 416-428) (the "subject barges") and added them to its fleet under a multi-year barge charter agreement with SCF Marine. (Doc. Nos. 121 at ¶7; 128 at ¶7). The barges were immediately loaded with coal near the

---

[5]
Mon River's fleet consists of three different size barges. Jumbo barges are the largest, and are approximately 195 feet long by 35 feet wide; standard barges are the smallest, at 175 feet long by 26 feet wide; and stumbo barges were a hybrid of the two, 195 feet long, but only 26 feet wide. (Doc. No. 114 at 94-95). Jumbo barges can carry approximately 1,800 tons of coal, while standards carry about 950 tons, and stumbos carry approximately 1,100. (*Id.*). Standard and stumbo barges are less common than jumbo barges in the barge industry, since their smaller capacity made them less efficient, but they were useful to Mon River because they could operate in the older, smaller locks on the Monongahela and Allegheny rivers, where jumbo barges would not fit. (Doc. No. 113 at 78-79).

shipyard where they were built in Missouri and sent to Pittsburgh. (*Id.* at ¶12). Upon arrival in Pittsburgh, on May 20, 2004, the barges were accepted into Defendant Industry's fleet to be fleeted at the Shell Dock. (*Id.* at ¶14-17; Doc. No. 80 at 1). Mon River had occasionally docked barges with Industry in the past, often for repairs, and Industry accepted them pursuant to its general practice of fleeting barges at a fixed rate per barge per day. (Doc. No. 110 at 4-6, 93-95). Defendant's harbor boat, the M/V Ranger, supervised the securing of the barges. (Doc. Nos. 80 at 1; 122 at ¶17; 122 at ¶17). They were rigged together and docked as part of a 15 barge tow, three barges (105 feet) wide by five barges (1000 feet) long. (Doc. Nos 113 at 58-59; 111 at 35). The other two barges in the tow were owned by another company, TECO Barge Line. (Doc. No. 110 at 6). The tow was secured with a thirty-five to forty foot steel cable headline, attached to the topmost (upstream) cell of the Shell Dock fleeting facility, and a number of secondary poly lines. (Doc No. 110 at 3, 19-22, 78). Further, there were four sidelines attaching the top six barges directly to the mooring cells of the Shell Dock fleeting facility, placed there to keep the barges from surging upriver from the wake of a passing boat, but not designed as load-bearing lines to prevent the barges from drifting downstream. (Doc. Nos. 110 at 3, 22-24; 111 at 4, 22-24). The bottom nine barges (the third through fifth rows of barges) were not attached directly to the mooring cells but only to the more upstream barges in the tow, so they were 'hanging' below the mooring cells. (Doc. No. 110 at 128).

During the night of May 21 to May 22, 2004, there was a rainstorm, which caused the river levels to rise approximately eight feet between 2:00 p.m. on May 21, 2004 and 2:00 p.m. on May 22, 2004. (Doc Nos. 110 at 32; 122 at ¶32; Exh. J-1). Although the barges were in its care, Industry did not assign anyone to check on them between 6:00 p.m. on May 21 and 6:00 a.m. on May 22. (Doc. No. 111 at 66). Mr. Bartley testified at trial that he was playing poker on the night of May 21.

(Doc. No. 111 at 30-31, 63-66).  At approximately 3:00 a.m., after his game, he went to the Industry Landing, located approximately 300 feet upstream from the Shell Dock, to check the barges.  (*Id.*).  He boarded the M/V Ranger and shone the boat's headlight down on the barges at the Shell Dock.  (*Id.*).  At that time he saw nothing amiss with the barges or how they were secured.  (*Id.*).[6]

Mr. Bartley testified that the next morning, May 22, he returned to work and took out the M/V Ranger with two other Industry employees at 6:00 a.m.  (Doc. No. 111 at 31-22).  At trial, he further testified that they began their inspection with the barges fleeted at the Shell Dock and worked their way upstream, and that they checked the subject barges two times, finding nothing of concern, before the eventual breakaway occurred.  (*Id.*).[7]  However, in his deposition before trial, he stated that they began the inspection with the upstream fleet and did not reach the Shell Dock until the afternoon of May 22.  (*Id.* at 66-67).  Mr. Bartley's deposition testimony is supported by the records in the M/V Ranger logbook, which indicate same. (Exh. P-29, D-54).  The Court finds the M/V Ranger logbook and the witness's earlier testimony more credible and, accordingly, finds that Mr. Bartley and the crew of the M/V Ranger did not inspect the subject barges until at least noon on May 22, 2004, as recorded in the logbook.  (Exh. P-28).[8]

---

[6]

Mr. Bartley did not mention this overnight inspection of the barges at his deposition before trial, and it is not recorded in the logbook of the M/V Ranger.  (Doc. No. 47-1; Exhs. P-28, D-54).

[7]

At trial, Mr. Bartley also testified that during the 6:00 a.m. inspection, he saw that the sideline, which would eventually become fouled, was "straight out," not angled up or down; he further testified that he anticipated that the river would rise that day and that the "prudent" thing to do would be to put the line at a higher level to prevent it from becoming fouled, though he did not do so at the time.  (Doc. No. 111 at 68-9).

[8]

As discussed below (Section III.E.2), two different pages of a logbook (Exhs. P-28 and P-29), both purporting to record the activities of the M/V Ranger on May 22, 2004, were produced.  One

8

At some point that morning, Mr. Busatto joined the crew of the M/V Ranger and when they inspected the barges at the Shell Dock at approximately 1:30 p.m., Mr. Busatto noticed a sideline that was fouled. (Doc. Nos. 121 at ¶22; 122 at ¶37). A "fouled" line is one that has been pulled taut at an angle because a change in the water level has caused the barge to be above its mooring point, making the line impossible to remove and in danger of snapping. (Doc. No. 110 at 40-44; Exh. P-1). Because the line was so taut that it could not be untied, they decided to cut it. (*Id.*)

To manage the fleet of barges while they cut the line, Industry sought the assistance of the M/V Arnie S., a towboat operated by First Energy at Bruce Mansfield across the river. (Doc. No. 121 at ¶23). The M/V Arnie S. and the M/V Ranger positioned themselves below (downstream of) the barges and pushed them slightly upstream so that Defendant was able to cut the line before allowing the boats to back off and the barges to rest on the headline and remaining lines. (Doc. No. 110 at 45-48).

Defendant next released the M/V Arnie S., and the M/V Ranger moved around to the side of the 15 barge tow, away from the shore. (Doc. Nos. 110 at 58-61; 111 at 35-37). Plaintiff contends that the M/V Ranger then pushed the lower part of the tow in toward shore, causing the upstream end to pivot outward, away from its moorings, citing the testimony of Mr. Busatto and Mr. Bartley. (Doc. Nos. 110 at 60-62, 69; 111 at 61-62). Defendant contends that the M/V Ranger was merely holding steady, closer to the center of the tow, not pushing in on the lower part, and not causing any pivot point, for which it also cites the testimony of Mr. Busatto and Mr. Bartley. (Doc. Nos. 110 at 105-06, 111 at 38-39). And, indeed, Mr. Busatto's and Mr. Bartley's testimony is unclear on these points. Furthermore, Mr. Bartley submitted a report of the incident to the United States

---

indicates that the day began at 7:00 a.m., while the other starts at noon. (*Id.*)

9

Coast Guard, on June 1, 2004, which contains a signed statement by Mr. Bartley indicating that "I was on the M/V Ranger shoved in on the 4 length down," i.e. on the lower part of the tow. (Exh. C-1, Report to USCG). In the report, neither Mr. Busatto nor Mr. Bartley mentioned a fouled line or the need to cut a fouled line to the Coast Guard. (*Id.*). In this Court's estimation, the testimony of Defendant's witnesses at trial contradicts both itself and Mr. Bartley's earlier statement to the Coast Guard. Nor did the Court find the trial testimony of Mr. Bartley or Mr. Busatto as to these facts credible. Accordingly, the Court finds that Mr. Bartley, piloting the M/V Ranger, did push inward against the lower portion of the tow, perhaps not trying to move them significantly, but intending to apply enough force to hold them in place and perhaps move them slightly closer to the moorings so that the line could be retied. This inward force on the lower part of the tow by the M/V Ranger caused the upper end of the tow to pivot outward.

At that moment, at approximately 3:30 p.m., before the cut line could be retied, the other lines securing the tow, including the headline, started to break and the entire tow drifted free of its moorings. (Doc. Nos. 80 at 2; 110 at 61-62; 111 at 39, 62). The M/V Ranger tried to maneuver to recapture the 15 barge tow, but was not able to do so and was pushed backward by the barges which had broken away. (Doc. Nos. 113 at 61-61; 111 at 69-70). The barges drifted out across the river and then downstream, striking several objects and at least one other vessel. (Doc. No. 113 at 83). As a result, twelve of Plaintiff's thirteen new barges were damaged. (Exhs. J-2 - J-5). Defendant has not provided an explanation for the cause of the breakaway. (Doc. No. 111 at 40)(Mr. Bartley testifying that he has no explanation for the breakaway).

At 3:25 p.m., five minutes before the breakaway, the Montgomery Lock & Dam, located approximately 2.5 miles upstream of the barges, raised its gates six feet, opening them fully. (Doc.

Nos. 110 at 109-110; 111 at 42). This would normally cause a rise in the water level below the dam, but the testimony of Defendant's witnesses Mr. Busatto and Mr. Bartley, and Mr. Bartley's report to the Coast Guard both demonstrate that, given that the current of the river was 5-7 miles per hour, any surge in the water level would not have reached the barges by the time of the breakaway. (Doc. Nos. 110 at 108-11; 111 at 42, 71-73). Accordingly, the Court finds that the opening of the dam gates and any subsequent increase in the water level were not related to the breakaway.

### 2.    Conclusions of Law

As this Court explained at the summary judgment stage, there is no question that a bailment existed in this case. The essential facts on this point have not changed since then; Defendant accepted Plaintiff's barges into its fleeting facility and stored them from May 20, 2004 to May 22, 2004. This scenario fits squarely within the definition of bailment under Pennsylvania law: "a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it." *Smalich v. Westfall*, 269 A.2d 476, 480 (Pa. 1970). The present arrangement was clearly a bailment for hire with Plaintiff as bailor and Defendant as bailee.[9]

"The operator of a fleeting facility as a bailee has the responsibility of caring for barges after

---

[9]

Defendant's attempt to characterize this as a "bailment for mutual benefit" rather than a "bailment for hire," thereby avoiding the *Louisiana* presumption, is unavailing. *The Louisiana*, 70 U.S. 164 (1865). A bailment for mutual benefit exists where a docking facility is used for the mutual benefit of the dock owner and the vessel owner, as when barges are docked at a mine awaiting loading or unloading. *Massman Constr. Co. v. Wayne B. Smith, Inc.* 526 F.2d 242, 244 (8th Cir. 1975) (barges docked at a quarry for repairs while awaiting loading created a bailment for mutual benefit). In the present case, Mon River's barges were docked at the Shell Dock for a daily fee (Doc. No. 110 at 4-6, 93-95), creating a bailment for hire.

they are committed to its custody." *Monsanto Co. v. Edwards Towing Corp.*, 318 F. Supp. 13, 15 (D. Mo. 1969) (quoting *Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104 (1941)).  This responsibility constitutes a duty to exercise reasonable care to prevent damage to the barges in its care.  *Consolidation Coal Co. v. United States Steel Corp.*, 364 F.Supp. 1071, 1074 (W.D.Pa. 1973); *Massman Constr. Co.*, 526 F.2d 242, 244 (8th Cir. 1975).  At trial, the burden to prove the lack of reasonable care rests on the plaintiff/bailor.  *Martin Marietta Corp. v. Peter Kiewit Sons' Co.*, 346 F.Supp. 892, 896 (E.D.N.Y. 1972)("Since the liability of a bailee is not that of an insurer, but must be predicated upon negligence, a bailor must prove the bailee's negligence, and that this negligence was the proximate cause of the damage or loss.").

However, admiralty law has long held that in a bailment for hire, when a bailee has exclusive control of the fleet, any breakaway is presumed to have been caused by the bailee's negligence.  *The Chickie*, 141 F.2d 80, 82 (3d Cir. 1944).  This "*Louisiana* presumption" owes its origin to the Supreme Court case of *The Louisiana*, 70 U.S. at 174 (1865), and is a specific application of the general principle of *res ipsa loquitur*.  *See American River Transp. Co. v. Paragon Marine Services Inc.*, 213 F.Supp.2d 1035, 1058-59 (E.D.Mo. 2002).  Though the plaintiff/bailor always bears the burden of proving negligence, a showing that the vessels were delivered to the bailee in good condition and were damaged while in the bailee's possession meets that burden and establishes a prima facie case of negligence, placing a burden on the defendant/bailee to produce rebuttal evidence.  *Consolidation Coal*, 364 F.Supp. at 1073-74 (W.D.Pa. 1973).  "By showing that the damage resulted after delivery of the [vessel] to the defendant, the trial shift[s] to the defendant the burden of proving an absence of negligence on its part."  *Id.* at 1073-74.

To rebut the presumption, a defendant must make a showing of a so-called 'inevitable

accident.'  Judge Learned Hand addressed this presumption in a similar case:

> [T]here are situations in which the law does not put the duty upon the sufferer to make proof at the outset; either because the facts are especially within the [bailee's] knowledge, or, as in the case of collisions with an anchored vessel, because usually there must be some fault, it is thought just to require the [bailee] to explain, and if he does not, to charge him. [The bailee's] duty is often spoken of as the defense of 'inevitable accident.'  Strictly it is no defense at all, but a true presumption; that is to say, a duty laid upon him to supply proof which casts him if he fails.
>
> This duty extends not only to disclosing what happened, but what was done to avoid, and what would have been necessary to prevent it.

*Cranberry Creek Coal co. v. Red Star Towing and Trans. Co.*, 33 F.2d 272, 274 (2d Cir. 1929).  In the present case, Defendant has not made any showing of inevitable accident such as an Act of God or other unforeseen and unforeseeable circumstance that gave rise to the breakaway.  And, the Court finds no evidence of such a circumstance.  In fact, even without affording Plaintiff the benefit of the *Louisiana* presumption, the Court is not convinced that the precautions undertaken by Defendant rise to the level of reasonable care.  Overnight, while the river was rising, Defendant checked the docked barges cursorily and sporadically, at best.  And, its maneuver the next day to cut the fouled line (which its own witness admits it would have been "prudent" to retie earlier (Doc. No. 111 at 68-9)) led to the breakaway itself.  Therefore, the Court finds that Defendant Industry was negligent and is liable for the breakaway of the subject barges.

## C.     OUT OF POCKET DAMAGES

### 1.     Repairs and Mitigation of Damages

#### a.     Findings of Fact

After the breakaway, the parties both hired marine surveyors to inspect the barges and assess

the damage to them.  Plaintiff hired Richard Davis[10] and Defendant hired Kevin Moran[11].  (Doc Nos. 113 at 94; 111 at 98-100; Exh. J-5).  They jointly surveyed the barges, performing both a topside survey immediately after they were recovered and a more thorough survey after they were unloaded and dry docked.   (Doc. No. 111 at 132-33).   The surveyors then prepared written reports documenting the type and extent of the damage to the barges, about which they were largely in agreement.  (Doc. Nos. 113 at 97-98; 111 at 100, 132; Exhs. J-3, J-5).

They agreed that three barges (MRT 417, 420, and 424) required immediate, temporary repairs before they could even be unloaded and inspected.  (Exhs. J-3 - J-5).  These repairs were performed at C&C Marine Maintenance Company.  (*Id.*).  They also agreed that one barge (MRT 423) did not require any repairs, and it was returned to service on June 10, 2004.  (Doc. No. 111 at 102; 113 at 215-16; Exh. J-3).  The remaining nine barges (MRT 416, 418, 419, 421, 422, 425, 426, 427, and 428) sustained damages, about whose nature the parties and their surveyors agree; but they disagree about whether they warranted immediate repair.  (Doc. Nos. 121 ¶¶47-48; 122 ¶¶61-63; 127 at 5-6; 128 ¶¶47-48).

The parties agree that the damage to the barges, after their temporary repairs, did not render the barges unseaworthy.   (Doc. No. 111 at 14-16).   However, Defendant contends that they were only "minor" or cosmetic damages which could have been repaired at any later time.  (*Id.*).  The

---

[10]

Richard Davis was the owner of Davis Marine Surveyors, where he had been performing marine surveys since 1975.  (Docket No. 103 at 4-5).

[11]

Kevin Moran was a field marine surveyor for Merrill Marine Services. He had 28 years of experience in the marine industry, starting as a deckhand, earning his operator's license for inspecting towing vessels, and then doing barge maintenance before working for 20 years as a marine surveyor. (Doc. No. 111 at 99-100).

Court finds that the evidence indicates that while the damages were not sufficient to render the barges unusable, they were not minor damages.  For example, one barge was damaged in an area 2 feet 8 inches wide by 24 feet long, and indented by half an inch; another was damaged in a nine foot square area, indented a full inch, with damage to the coating that was already beginning to rust. (Doc. Nos. 111 at 139-40; 112 at 106-08).  Nonetheless, Industry's inspector, Mr. Moran, testified that he informed Plaintiff's representative that they could defer the repairs on the barges without compromising their seaworthiness.  (Doc. No. 111 at 116).

Mon River, however, chose not to defer the repairs, because, as Mr. Guttman testified: (1) he feared there might be safety issues with some of them; (2) he was concerned that if the barges were subsequently damaged in another incident it would cause confusion about the source of particular damages;[12] and (3) the coating having been damaged, the barges were more susceptible to rust.  (Doc. No. 113 at 103-04).  Furthermore, the barges were chartered from a third party, SCF Marine, which required that Mon River would be responsible for any repairs at the end of the charter if the barges were damaged, including rust and damage to the coating.  (Doc. No. 99 at 7-9).  Myron McDonough, vice president of SCF Marine, expected the barges to be repaired to as-built condition, and the charter agreement from SCF specified that they should be returned "in like good order and condition as when originally delivered to [Mon River], ordinary wear and tear excepted," and "[Mon River] shall pay all costs of redelivery, cleaning, repair, or recoating necessary to restore the Barge to its on-hire condition."  (*Id.*; Exh. P-21).  Mr. Kula, the insurance claims manager handling

---

[12]

Indeed, Mr. Busatto, in his trial testimony, supported this argument.  He stated that it was not possible for a marine surveyor to accurately determine whether the damage to the subject barges had been caused by the breakaway or by wear and tear during the barges' maiden voyage before the breakaway.  (Doc. No. 110 at 143-46).

Industry's claim, testified that he (on behalf of Defendant) would have compensated Plaintiff immediately for its damages, even if the repairs were delayed until later, based on both surveyors' estimates. (Doc. No. 112 at 106-07). However, that payment would necessarily be an estimated sum, rather than being based on actual receipts for repairs. Any unexpected expenses once the barges were eventually repaired would be borne by Plaintiff, and might not be reimbursed by Defendant since payment had already been made. (*Id.* at 106-08). Mon River sent requests for bids on all twelve damaged barges to multiple repair facilities, including: Blank Welding in Pittsburgh, Pennsylvania; C&C Marine in Pittsburgh, Pennsylvania; O-Kan Marine in Gallipolis, Ohio; McGinnis, Inc. in South Point, Ohio; Jeffboat in Jeffersonville, Indiana; and Trinity Industries in Caruthersville, Missouri where the barges had been built. (Doc. No. 111 at 117, 133).[13] Mr. Moran agreed that sending requests for bids to multiple shipyards made sense to ensure that the barges were returned to service as quickly as possible. (*Id.*)

Mr. Moran, however, did not agree with Plaintiff's insistence that wheelabrated steel be used for the repairs. (Doc. No. 111 at 134).[14] The barges were originally built with wheelabrated steel

---

[13] At trial, Mr. Busatto testified that Industry would "most definitely" have bid on the repairs given the opportunity and "probably would have had a little sharper pencil considering the circumstances in this situation," but Mon River did not send Industry an invitation to bid. (Docket No. 110 at 116). Considering the damage that had just occurred to Plaintiff's barges while in Defendant's care, the Court hardly finds it surprising that Plaintiff did not think to entrust them immediately to Defendant for repairs.

[14] Wheelabration is a method of preparing and coating steel. It involves the heating of a steel plate to remove moisture and then blasting it with steel pellets to remove grit and rust before it is coated with zinc to prevent rust. The entire process takes place while the steel is hot and in an enclosed area to prevent the interference of moisture or foreign particles with the coating process. (Doc Nos. 96 at 7-9; 99 at 6-7). Other methods can be used to achieve similar results, including sandblasting, though the process is not the same, the metal is not heated, and it is not necessarily done in an enclosed area. (Doc. No. 96 at 9-11).

16

as per the specifications of their owner, SCF Marine, from whom Mon River had chartered them. (*Id.*; Doc No. 99 at 6).  Mr. McDonough testified that SCF would expect barges that were damaged on their maiden voyage to be repaired to their as-built condition using wheelabrated steel, and that the charterer, Mon River, would bear the risk of any damage to the coating of the barges upon their return. (Doc. No. 99 at 7-11).[15]  Mr. Davis, surveyor for Mon River testified that in the normal course of surveying he would recommend repairs "as per original construction.  If it's wheelabrated [sic], the it will be wheelabrated [sic].  If not, then it may not be."  (Doc. No. 103 at 29).

Bids were received from four repair facilities: C&C Marine; Blank Welding; Jeffboat; and O-Kan.  (Doc. No. 113 at 99).  Mr. Guttman testified on behalf of Mon River that it chose to send six barges to Jeffboat in Jeffersonville, Indiana, and six barges to O-Kan in Gallipolis, Ohio because they had done an analysis that the total of the bid prices plus the costs for transportation was less expensive than the other, local alternatives.  (Doc. No. 113 at 191).  The parties agree that it was most cost-effective to send the barges to more than one shipyard, in order to minimize the time for the repairs. (*See* Doc. No. 111 at 117, 133).  Mon River then awarded the bids to Jeffboat and O-Kan, but only informed Industry and Mr. Moran afterward.  (Doc. No. 111 at 118).  Jeffboat was the nearest shipyard to Pittsburgh that was capable of providing wheelabrated steel, and O-Kan was the

---

[15]

The Charter Agreement between Mon River and SCF did not specify the use of wheelabrated steel, but read, in relevant part:

> In the event any barge is damaged or suffers any partial loss (short of actual or constructive total loss), the Charterer shall arrange for the repair of such barge, including proper coating of all replacement steel and welds, and shall pay the costs thereof and other expenses thereof, including the charter hire as noted in Section I.

(Exh P-21).

closest repair yard to Jeffboat, aside from McGinnis, which had not bid on the repairs.  (Doc. No. 111 at 134-35).  Defendant contends that it would have taken less time to transport the barges, and would consequently have been less expensive, if the barges were repaired locally, and further contends that C&C Marine in Pittsburgh could have repaired the barges using wheelabrated steel, but has provided no evidence as to the costs or transit time for shipping wheelabrated steel from Jeffboat or elsewhere to C&C Marine.  (Doc. Nos. 111 at 130; 113 at 178-82).

Subsequently, the barges were sent to Jeffboat and O-Kan for repairs, which were completed at different times between June 2004 and late September/early October 2004 (the "repair period"). (Doc. No. 113 at 100-01; Exh. P-13).  The barges were returned as follows:

| Date | Event | Barges Unavailable | Lost Barge Days[16] |
|---|---|---|---|
| May 22, 2004 | Breakaway | 13 | 0 |
| June 10, 2004 | Barge #423 returned to service | 12 | 286 |
| August 5, 2004 | Barge # 428 returned to service | 11 | 636 |
| August 6, 2004 | Barge # 421 returned to service | 10 | 11 |
| August 12, 2004 | Barge # 418 returned to service | 9 | 60 |
| August 13, 2004 | Barge # 416, 426 returned to service | 7 | 9 |
| August 19, 2004 | Barge # 424, 425 returned to service | 5 | 42 |
| September 1, 2004 | Barge # 427 returned to service | 4 | 65 |
| September 17, 2004 | Barge # 419, 422 returned to service | 3 | 64 |
| September 30, 2004 | Barge # 420 returned to service | 1 | 26 |
| October 15, 2004 | Barge # 417 returned to service | 0 | 15 |

---

[16]

The total number of lost barge days is discussed in Section III.D.4.b.i below.

(Exhs. P-7, P-14; Report).  After these repair facilities had been chosen, and the barges were sent to them, O-Kan informed Mon River that it needed to change its bid price because it had not bid based on using wheelabrated steel.  (Doc. No. 113 at 183).  This increased the total cost of the repairs by approximately $15,000 and resulted in some delay to the repairs while Plaintiff decided how to proceed and consulted with the barge owner, SCF.  (Doc. Nos. 111 at 119-20; 113 at 183-87).  In total, the actual costs of the repairs at Jeffboat and O-Kan, including the costs of transportation, were still lower than the bids received for local repairs in Pittsburgh by $13,467.00. (Doc. No. 113 at 100; Exh. P-19).

### b.    Conclusions of Law

Where a vessel is not a total loss, the owner is entitled to recover the reasonable cost of repairs necessary to restore it to its condition before the incident. *See* 2 ADMIRALTY AND MAR. LAW § 14-6 (4th ed.).  "*Restitutio in integrum* is the leading maxim in such cases, and where repairs are practicable the general rule followed by the admiralty courts in such cases is that the damages assessed against the [defendant] shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred."  *The Baltimore*, 75 U.S. 377, 385 (1869). Applying this standard, and considering that these were brand new barges on charter from a third party who expected that they would be repaired with wheelabrated steel (Doc. No. 99 at 7-11; Exh P-21), the Court finds that it was reasonable for Plaintiff to demand that the barges be repaired with wheelabrated steel in order to return them as nearly as possible to their condition before the incident. Mon River reasonably considered that it owed a high duty of care to SCF to return the barges in reasonable condition at the end of the charter, and damage of this nature so early in the charter merited a return to as-built condition.  Further, the Court finds that it was reasonable for the barges

19

to be sent to Jeffboat and O-Kan for the repairs to be performed, because this was the most economical means to perform the repairs.

Defendant contends that Mon River failed to mitigate its damages because it could have deferred the repairs and kept the seaworthy barges in service until their next scheduled lay-up. (Doc. No. 115 at 6-8).  According to Defendant, doing so would have minimized or eliminated the lost profits damages discussed below.  (*Id.*).  For the following reasons, the Court does not agree.  In an oft-cited opinion, Judge Learned Hand addressed this question for the Court of Appeals for the Second Circuit, in a case where the owner had stipulated that immediate repairs were not necessary to render a damaged ship seaworthy but that he nonetheless thought it advisable to make them at once:

> The District Court thought that it made no difference whether the collision repairs were in fact immediately necessary, so long as the owner believed it prudent to make them at the time.  We agree, provided the owner's conclusion be well founded; that is to say, the tort-feasor may not complain if, in the situation in which the collision has placed the owner, he is reasonably apprehensive as to the seaworthiness of his ship.
>
> . . . .
>
> The test in such case is, not the judgment of the victim of the wrong, but the objective standard of a reasonable person.

*Pan-American Petroleum & Transp. Co. v. United States*, 27 F.2d 684, 685 (2d Cir. 1928)(citing *The Baltimore*, 75 U.S. at 388).[17]  Similarly, in the instant case, the parties agree that at least nine of the damaged barges were seaworthy and could continue in service.

The rule articulated in *Pan-American* was subsequently refined in *The Pocahontas*, 109 F.2d

---

[17]   In *Pan-American*, the appeals court remanded the case for the district court to determine if the stipulation indeed meant that the owner did not honestly believe that the repairs were necessary to render the vessel seaworthy. 27 F.2d at 686.

929, 931 (2d Cir. 1940), and has since been applied in this circuit:

> Even if the collision damage does not in fact require immediate repairs, the owner may in good faith and reasonably believe that it does; and, in that event, he would be justified in sending her to dry-dock. [*Pan-American*, 27 F.2d at 685]. In such a case, if dry-docking discloses that the vessel is still seaworthy and if the owner nevertheless decided to proceed with permanent repairs rather than to return the vessel to service and postpone permanent repairs until the period of general overhaul, the question will arise whether detention damages will be for the owner's account or the tort-feasor's. It would seem that the answer should depend on what is reasonable conduct under all the circumstances and in the light of the rule that even a tort-feasor is entitled to the benefit of the principle of avoidable damages.

109 F.2d at 931; *Atlantic Refining Co. v. Matson Navigation Co.*, 150 F.Supp. 516 (E.D.Pa. 1957).

In the instant case, considering both Plaintiff's duty to mitigate its damages and the following specific circumstances, the Court finds that Plaintiff's conduct in sending the barges for immediate repair was reasonable. First, the parties do not contest whether the initial decision to take the barges out of service and to dry-dock them was reasonable; both recognized the need to ascertain the extent of the damages. Second, they were new barges, chartered from a third party, and Plaintiff reasonably considered that it owed a high duty of care to SCF. Third, it was reasonable for Plaintiff to fear that, if the barges were damaged again in the future or even suffered normal wear and tear on top of the breakaway damage, such damage could become confused with subsequent damage, causing Plaintiff to bear the expense of repair or to risk returning the barges to SCF in damaged condition. Fourth, there is no evidence that the barges were scheduled to be taken out of service in the near future, and they had already begun to rust as a result of the breakaway causing further damage; so doing nothing could reasonably be expected to result in further damage. Fifth, as discussed below, the summer of 2004 was, indeed, a slow season for Plaintiff's business, and taking the barges out of service at a later date could have resulted in greater lost profits. Therefore, the Court finds that Plaintiff did not fail

to mitigate its damages.

### 2.  Out of Pocket Damages Calculations

The Court finds that Mon River suffered the following out of pocket damages as a result of the breakaway.  First, Plaintiff paid a total of $262,974.16 for the transportation and repair of the subject barges.  (Doc. No. 114 at 127; Exhs. J-10, P-4).  Second, Plaintiff paid $10,726.75 to its surveyor, Richard Davis.  (Exhs. J-3, J-10, P-4).  Third, Plaintiff paid barge costs – the daily rent that Plaintiff was paying to SCF per barge ($75.00) plus the daily cost of insurance per barge ($5.71) – each day the barges were out of service for repairs of $80.71 per day.  (Doc. No. 114 at 128, Exh. P-5).  Because the Court does not adopt Plaintiff's proposed value for the total number of lost barge days (see below), the Court will not adopt Plaintiff's proposed total Barge Costs value of $99,192.59. Instead, based on a total number of lost barge days of 1,122,[18] the Court finds that Plaintiff incurred $90,556.62 in Barge Costs.

| | |
|---|---|
| Transportation and Repairs | 262,974.16 |
| Surveyor | 10,726.75 |
| Barge Costs | +  90,566.62 |
| **TOTAL Out of Pocket Damages** | **$364,257.53** |

All of these are fair and reasonable damages.  Hence, Plaintiff suffered total out of pocket damages of **$ 364,257.53.**

### D.  LOST PROFITS DAMAGES

There is significant contention between the parties as to whether Plaintiff has demonstrated that it had to forego additional profits while the barges were being repaired.  In making its findings

---

[18]

The total number of lost barge days is discussed in Section III.D.4.b.i below.

of fact regarding lost profits, the Court considers the parties' arguments, the evidence of record, and also the report of the Special Master, which it adopts, in part, and rejects, in part.  In making these findings, the Court applies the standard to which Plaintiff must show lost profits, discussed in Section III.D.1. below, that is to say, that lost profits must be shown to a reasonable certainty.  The relevant factual questions are whether there was a market for barges with demand at the time; whether Plaintiff could have and would have participated in the market if the barges were available; and what profits, if any, Plaintiff could reasonably expect to earn from participating in said market.[19]

Over the course of these proceedings, Plaintiff has presented evidence that could be used for three different Lost Profits calculations, based on: (1) Demurrage, (2) Market Value, or (3) Lost Opportunity or Value of Use.[20]  Only the last of these was analyzed by the Special Master, but the Court will consider his analysis as it concerns all of them.  (Appendix).

### 1.      The Special Master's Report and the Standard of Proof for Lost Profit Damages

The Special Master made a number of specific findings regarding Plaintiff's claim for Lost Profits, focusing primarily on Plaintiff's Loss of Opportunity claim.  (Appendix).  The Special Master concluded that:

> The Plaintiff's damage calculation does not meet the legal standard of proof required in this matter.  Specifically, Mon River has not proven that profits have been, or may [be] reasonably supposed to have been, lost, nor does it determine the amount of that loss with reasonable certainty.  The Plaintiff's lost profit assumptions are based on

---

[19]

These are essentially the questions the Court presented to the Special Master in its Order appointing him and its Memorandum Opinion regarding calculation of lost profits damages which it provided to assist him. (Doc. Nos. 132, 134).

[20]

As Mr. Guttman testified, and as Plaintiff's counsel argued at trial, the initial calculation using demurrage was, in effect, a quick shorthand calculation to get a prompt resolution of the claim. (Doc. Nos. 113 at 114-15; 114 at 6-7).

> speculative evidence of the income and costs normally attributed to the damaged vessels. Mon River has failed to provide factually-supported financial and operating evidence that would confirm or verify the appropriateness of the underlying assumptions used in its claim for lost profits.

(Appendix at 6-7). The Court does not adopt this ultimate finding because it finds that the Special Master applied an accounting standard which goes beyond the standard of proof required by law, but the Court will adopt a number of more specific findings of the Special Master, as discussed below.

The United States Supreme Court established the legal standard for showing lost profits for damaged vessels in an admiralty case over 100 years ago:

> [T]he loss of profits or of the use of a vessel pending repairs, or other detention, arising from a collision or other maritime tort, and commonly spoken of as 'demurrage,' is a proper element of damage. . . . [H]owever . . . demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty. . . . [T]wo things are absolutely necessary – actual loss, and reasonable proof of the amount.

*The Conqueror*, 166 U.S. 110, 125 (1896) (internal quotations omitted). A court must determine whether a plaintiff has shown that profits may be reasonably supposed to have been lost, and that the amount can be reasonably proved. *Id.*; *see also*, *Crain Brothers, Inc. v. Duquesne Slag Products Co.*, 273 F.2d 948, 950 (3rd Cir. 1959).

For the first showing, the existence of lost profits, as the Court explained in its summary judgment opinion in this matter, in order to show that profits may be reasonably supposed to have been lost,

> it is necessary that the vessel could have been profitably employed during the period of her detention, and probably would have been. However, a plaintiff seeking detention damages in an admiralty case need not prove a specific lost opportunity. Profits may reasonably be supposed to exist, and may be an item of damage, if a vessel was active in a ready market prior to a collision.

24

*Mon River Towing, Inc. v. Industry Terminal and Salvage Co.*, C.A. 06-1499, 2009 WL 904701 (W.D.Pa. Mar. 31, 2009)(quoting C.J.S. COLLIDE § 255). Although no showing of a specific lost opportunity is required, some proof of lost opportunity in general must be provided, even when "it seems likely that, with so much equipment out of service at a busy time, diminished ability to transport [cargo] would result in some economic loss." *Crain Brothers*, 273 F.2d at 950. The plaintiff must make some "showing of diminished profits" that are attributable to the loss of the plaintiff's vessels such as forfeited business, or increased costs of continuing business utilizing only the remaining vessels. *Id.* In *Crain Brothers*, for example, no substitute vessels were obtained, and the plaintiff used its own excess barges without added expense to complete its business. *Id.* The only relevant evidence presented was "the number of days that each barge was out of service and testimony that the charter rate for open steel barges of this type in the Pittsburgh area at the time in question was twenty dollars a day [, plus] testimony that the barges were damaged during a busy season and at a time when there was a general shortage of such vessels in the area," which the Court of Appeals for the Third Circuit found was insufficient proof, remanding the case for a further showing of lost opportunity. *Id.*

For the second showing, the measurement of lost profits, *The Conqueror* established that, where the beneficial use of a vessel has been lost, the income that the ship would have earned is the gauge for lost profits. *The Conqueror*, 166 U.S. at 127. The Court specified two measures for determining such damages, the market value and the value of use:

> [1] The best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market.
> . . . .
> [2] In the absence of such a market value, the value of her use to her owner in the business in which she was engaged at the time of the collision is a proper basis for

estimating damages for detention

*Id.* These correspond to the two means elucidated by the Third Circuit in *Crain Brothers*:

> Where, as here, demurrage is claimed for a ship used exclusively to transport cargo
> . . . the damage may be shown by the cost of a substitute or by proving the loss to the
> business of the shipowner by being deprived of the use of the ship in that business.

273 F.2d. at 950-51 (quoting *Sinclair Refining Co. v. The American Sun*, 188 F.2d. 64, 66 (2d Cir.

1951)).  Whichever measure is used, it must allow "the amount of such profits [to be] proven with

reasonable certainty." *The Conqueror*, 166 U.S. at 125.[21]

The preferred measure, market value for vessels of the same size and class, is not always

available, but may be for barges because they are largely fungible.  As the *Conqueror* Court notes,

"this criterion cannot be often applied, as it is only in larger ports that there can be said to be a

market price for the use of vessels." *Id.* at 127.  "[T]his can often be accomplished with barges, but

only occasionally with larger vessels."  David J. Sharpe & Robert B. Acomb III, *Damages*

*Recoverable in Collision and Stranding Cases*, DAMAGES RECOVERABLE IN MARITIME MATTERS

1, 5 (Robert B. Acomb, Jr. ed., 1984).

If the market value cannot be reasonably calculated, then damages can be based on the value

of use to or lost opportunity of the owner, which can be shown by the books of the owner providing

---

[21]

This is analogous to the standard for showing lost profits in non-admiralty cases.  In *Malley-
Duff & Associates, Inc. v. Crown Life Insurance Company*, 731 F. 2d. 133 (3d Cir. 1984), the Court
of Appeals for the Third Circuit noted that "[W]hile the damages may not be determined by mere
speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter
of just and reasonable inference, although the result be only approximate." *Malley-Duff*, 731 F. 2d.
at 148.  While assumptions about values are allowed in calculating loss, the assumptions must be
based upon sufficient factual support; a reasonable quantity of data must exist. *Id.* The court further
noted that many industries have respective formulas or rules for making calculations regarding the
value of business, and those should be followed when determining loss. *Id.* at 149.

the profits earned just prior to being taken out of service, or by witness testimony with strong factual support. *The Conqueror*, 166 U.S. at 128.  "Mere opinions," witness testimony on its own, is too speculative to be considered an accurate estimation. *Id.* at 127-28.  To illustrate this point, in *The Conqueror*, the Supreme Court cited a case involving the ferryboat Cayuga.  *Id*. at 128.  In that case, the testimony of an experienced ferryman as to the charter value of the Cayuga was accepted by the court as evidence for calculation of lost profits, because the testimony was backed by receipts the Cayuga had received before being damaged.  *Id.* at 128. (citing *The Cayuga*, 2 Ben.125, Fed. Cas. No. 2,537, *aff'd*, 14 Wall. 270).

Finally, basic accounting principles require that more than the rate of hire for comparable vessels or the expected revenue from normal use must be shown.  The plaintiff must also show, to a reasonable certainty, the costs that it avoided by not using the barges at the time.  *See Charles Zubik & Sons, Inc. v. Ohio River Co.*, 208 F.Supp. 71, 76 (W.D.Pa. 1962)(holding that lost profits had not been shown to a reasonable certainty when no evidence had been presented as to certain costs avoided by the plaintiff).  Once shown, these costs must then be subtracted from any lost revenues to determine lost profits.

Accordingly, the Court finds that on some issues the Special Master held the Plaintiff to an overly high standard of proof.  As discussed below, the Court will review the Special Master's findings individually and make its own findings as to whether Plaintiff has met the legal standard of proof on each one.

**2.**    **There Was a Market for Barges in the Relevant Time Period**.

*a.*    ***Plaintiff's Claim for Lost Profits Based on Demurrage***

Demurrage, the charge payable to a barge company like Mon River when a customer keeps

its barges out of service longer than anticipated, is often a term in shipping contracts for barges, and it formed the basis for Mon River's first damages demand from Industry.  (Exhs. D-3, D-4, D-5).  When Plaintiff initially sent this demand to Defendant, it did so in a good faith attempt to resolve the issue quickly, even though, as Mr. Guttman informed Defendant, it was likely that the actual rate of its lost profits would be higher.  (*Id.*).  But, Industry rejected demurrage as a basis for damages, demanding more concrete proof and more exact calculation of lost profits. (*Id.*).  It may not be technically correct to say that there was a demurrage "market," but the Court finds that demurrage is one measure of the daily payment one party would make to another for depriving it of the use of its barges, and accordingly, it is a useful estimate of lost profits damages.   Plaintiff submitted a calculation for damages totaling $85,157.71, based on a demurrage rate for these barges of $150.00 per day, which was based on the contract they were under at the time of the breakaway.  (Doc. Nos. 113 at 80-81; 114 at 207-208; Exhs. P-12, P-23).

### b.        *Plaintiff's Claim For Lost Profits Based on Market Value*

To establish that there was demand in the market for barges at the time, Plaintiff also presented the letters (Exhs. P-10, P-11) and depositions (Doc. Nos. 97 and 98) of Larry Barbish and Mark Fletcher.  In 2004, Mr. Barbish was Vice President of Business Development and responsible for the dry cargo operations of Canal Barge, a barge company.  (Doc. No. 97 at 5).  Mr. Fletcher was a managing member of Ceres Consulting L.L.C., which owns and operates barges throughout the inland waterway system, including the Pittsburgh area rivers where Mon River operates.  (Exh. P-11; Doc. No. 98 at 5).  Both testified that there was a market for new jumbo barges in the spring and summer of 2004 on the inland river system at a rate of $200.00 to $300.00 per day.  (Exhs. P-10, P-11; Doc. Nos. 97 at 7-10; 98 at 6-8).  Mr. Barbish described the market on the inland waterway

system, including Pittsburgh, as having "an unprecedented increase in demand for barges" throughout 2004 and stated that he was "doing quite a bit [of business] in the Pittsburgh area because of that nice market up there." (Doc No. 97 at 9).  Mr. Barbish further testified that Canal Barge would operate barges itself when the market demand was high and would charter barges out when the demand was low, and that at the time Mon River "had barges of mine on charter and I had been begging [Mr. Guttman of Mon River] to give them back to me as quickly as possible because I needed them for business of my own." (*Id.* at 6).  Mr. Fletcher testified that the market was "relatively tight" in the spring through the fall of 2004, and that Mon River approached him to charter barges at some point in 2004, but that he had been unable to accommodate Plaintiff because "we had everything out in use, and we couldn't give him any." (Doc. No. 98 at 7-8).  Mr. Barbish and Mr. Fletcher both testified that Plaintiff had sought to charter more barges from them in 2004, which they were unable to supply, but could not be sure of the specific dates.  (Doc. Nos. 97 at 6; 98 at 7-8, 39-40).

At trial, Mr. Guttman testified that Plaintiff had chartered barges to other companies in the past, though he did not specify when or how often.  (Doc. No. 113 at 36-37).  Specifically, he testified as follows:

> Q:   Have you chartered barges from other companies?
> A:   I have chartered barges in, yes.
> Q:   Have other companies chartered barges from you?
> A:   I have chartered barges to other companies as well.
> Q:   Have you chartered your boats to other companies?
> A:   I have chartered boats to other companies.
> Q:   Have you chartered boats in from other companies?
> A:   Yes, I have. I chartered boats from other companies.

Defendant argues that Mr. Guttman's testimony stating that the barges were intended for the First

Energy contract (Doc. No. 114 at 29-31) indicates that they would not have been chartered, but that conclusion does not necessarily follow, and, indeed, Defendant argues elsewhere that they would *not* have been used to service that contract at the time.  (Doc. No. 139 at 4)

The nearest analogous case is *Crain Brothers*, in which the plaintiff barge owner sought damages based on the charter rate for barges of the same type as those that were damaged.  273 F.2d 948; *see also Skou v. United States,* 478 F.2d 343 (5th Cir. 1973).  The only substantive difference in the proof offered here in comparison to *Crain Brothers* – where the plaintiff also offered evidence of the charter rate for similar barges at the time of their damage – was that in that case the plaintiff "had not released any of its idle barges to others on charter." *Crain Brothers*, 273 F.2d at 950.  In that instance, the court found the proof "insufficient to support an award of [lost profits] damages," but nonetheless remanded for further evidence, given the "normal expectation of substantial injury as the result of the disabling of so many vessels as were damaged in this case . . . although such evidence was not included in the original presentation." *Id.* at 951.  Plaintiff's evidentiary support for the Market Rate value, based largely on the testimony of Mr. Barbish and Mr. Fletcher, is very similar to the evidence that was not accepted by the *Crain Brothers* court, and is lacking in receipts or other credible, factual support as called for in *The Conqueror*.  *Crain Brothers*, 273 F.2d at 950; *The Conqueror*, 166 U.S. at 128 (citing *The Cayuga*, 2 Ben. 125).  And, like in *Crain Brothers*, Plaintiff did not charter any barges to replace those that were damaged; new barges were being added to Mon River's fleet during the repair period, and Plaintiff used those to service its existing contracts. (Exhs. P-15, P-16).  The Court considers it a close call, but finds that, like the plaintiff in *Crain Brothers*, Mon River has not presented sufficient, substantiated evidence to show lost profits based on the market value for chartering its barges.

### c.       *Plaintiff's Claim for Lost Profits Based on Lost Opportunity*

Plaintiff relies on a variety of evidence to calculate an estimate of the opportunities to use the barges that were lost while they were being repaired, based on estimates of how much coal the barges could have carried, how often they would do so, and what the rates would be for them to do so.  To show that there was a ready market with demand for barges to haul coal, Plaintiff presents evidence that it was participating in that market itself.  (*See* Exhs. P-6, P-7, P-8, P-15, P-16,P-17, P-25, P-27, J-6).  And, it is clear that Plaintiff was using its other barges to transport coal during the relevant time period.  (Exh. P-8, J-6).  Mr. Barbish and Mr. Fletcher also both testified that there was a market for transporting coal at the time.  (Exhs. P-10, P-11; Dep. Barbish 7-10; Dep. Fletcher 6-8).

Based on the evidence of record, the Court finds that the demurrage rate for the barges in question under their then current contracts was $150.00 per day.  The Court further finds that there was an active market for transporting coal, in which Mon River could have participated with the subject barges, and in which it was already participating with its other barges.

### 3.       **Plaintiff Did Not Have Excess Available Barges That It Could Have Used to Participate in Said Market.**

In addition to showing that there was a market available, Plaintiff must demonstrate that it would have participated in the market but for the unavailability of the subject barges.  To do so, it must demonstrate that it did not have excess barges available at the time.  If Plaintiff had extra barges available that it could have used for any available business but it did not do so, then it cannot be said that profits may be reasonably supposed to have been lost.  *Dow Chemical Company v. M/V Roberta Tabor and M/V Sugarland etc., et al.*, 815 F.2d 1037 (5th Cir. 1987);  *Crain Brothers*, 273 F. 3d. 948.

The Special Master analyzed the "green sheets," handwritten ledgers recording the activities of Plaintiff's barges (Exh. J-6),[22] to determine whether Plaintiff was using its available barges fully during the repair period, or whether it had excess capacity with which it could have serviced any additional available contracts. The Special Master determined that, if Mon River loaded its barges in October 2004 at a rate of one load per barge every 12.3 days, then any time it was not using its barges at that rate (as was the case during the repair period) it was likely working below full capacity. (Appendix at 2-4). The Special Master also found that while the number of available barges increased over the time period analyzed, as Mon River added new barges to its fleet, certain months, particularly September, showed significant drops in tons hauled, indicating excess capacity. (*Id.*). He does note that Plaintiff's personnel testified that the entire fleet was actively engaged during the repair period, but discounts this testimony because, he states, even if the whole fleet were active, that would not necessarily mean that it was being used to full capacity (i.e., as efficiently as possible). (*Id.*). For the reasons discussed below, the Court does not adopt this finding.

Plaintiff objects strenuously to the Special Master's conclusion that it had excess capacity during the repair period. (Doc. No. 137). Plaintiff specifically argues that the Special Master has confused two distinct ideas: "capacity" and "available barges." (*Id.* at 5). According to Plaintiff, "capacity" indicates the total amount of barge space in the fleet, while "available barges" indicates the barges that can actually be moved to a customer for loading. (*Id.*). In short, Plaintiff contends

---

[22]

The Special Master points out that the green sheets are handwritten ledgers that are sometimes difficult to decipher, so the calculations based on them may be suspect, but since they are the means by which Mon River accounted for its barges in the normal course of business, and since neither party contests their validity, the Court finds that they are reliable, admissible evidence. (Appendix at 2).

that sometimes when barges are empty, they are nonetheless not available for use on other contracts. As Plaintiff puts it, "'[a]vailable barges' would be those that are neither in a customer's fleet waiting to be loaded, nor in a fleet waiting to be picked up after unloading and returned to the mine, but are empty barges which can be taken to a new customer for loading without jeopardizing the number of barges needed to service existing business." (Doc. No. 137 at 5). The Court finds this definition persuasive and consistent with the testimony at trial.

Mr. Seiler, Mon River's controller, testified that in July the coal mines serviced by Mon River normally shut down for the miners to take vacations, which caused an annual decrease in the amount of coal transported by Mon River at that time. (Doc. No. 114 at 200). Mr. Barra, the Sales Representative for Mon River who was responsible for securing business, provided uncontested testimony that while the miners' vacations lowered the total number of tons carried and the frequency of loadings in July 2004, the barges dedicated to those contracts were not available for other work because there was not enough time to use them elsewhere and then return them to their use at the mines when vacation ended. (Doc. No. 114 at 101). Mr. Barra also testified that as new barges came in, he used them to replace older, smaller barges, which he then used elsewhere, allowing him to increase the total amount of coal transported by approximately 1,800 tons per new barge. (Doc. No. 114 at 100-06). As for the Special Master's conclusion that the drop in total tons carried in September indicated excess capacity or barges available at that time, Mr. Barra testified that the rate of business at that time was slower because of Hurricane Ivan, which would not make any more barges available and would also not prevent the new barges from being used, albeit at the same slower rate. (*Id.* at 103-04). Finally, Plaintiff has introduced evidence that the subject barges were in demand, in that they were immediately put in service and loaded when they were built and again

as soon as they were repaired.  (Doc. No. 114 at 98; Exhs. P-4, P-14).

Defendant, unsurprisingly, urges the Court to adopt the findings of the Special Master regarding capacity and argues that Plaintiff's distinction between "capacity" and "available barges" is merely an indication that Plaintiff did not use its fleet efficiently during the repair period. (Doc. No. 139 at 2-3).  Defendant relies, in part, on the trial testimony of its surveyor, Mr. Moran, who testified that Plaintiff advised him that it did not have an immediate need for the barges when they were taken out of service for repair.[23]  (*See* Doc. No. 139 at 3).  And Defendant has argued throughout that the relevant time period was a "slow season" for barges, which, indeed, it appears to have been (*see below* Section III.D.4.b).[24]  Defendant also argues that Mr. Kyle, Plaintiff's

---

[23]

At trial, Mr. Moran testified that in a June 14, 2004 meeting with representatives from Mon River Towing:

> [T]hey said that they wanted to get them fixed as soon as possible so that – before their busy season started so they would have access during their busy season.  So they wanted to get them all done as fast as possible.

Q.    During that meeting, did anyone indicate, did anyone from Mon River indicate that they needed the barges immediately?

A.    Not at that particular time, no.

(Doc. No. 111 at 116).  However, this testimony was objected to as hearsay in that there was no showing that the gentleman who allegedly made these remarks, Mr. Ehringer, had authority to bind Plaintiff, and the Court did not admit it.  (*Id.* at 105-12 ("the hearsay objection is sustained . . . the hearsay objection is still sustained . . .  He [Mr. Moran] can tell us what he told them.  I think that's where we need to be. . . . So I think what we need to hear from Mr. Moran is what did he tell these gentlemen at that meeting.").  The Court did allow Mr. Moran to testify to his own role in the meeting, and he testified, without objection, to the contents of a subsequent call from Mr. Ehringer: "I believe it was the next day that Mr. Ehringer, I believe it was Dick Ehringer called me and said that any agreements that were made at the meeting were no longer valid and they were going to repair every distortion found on the vessel." (*Id.* at 113).

[24]

The Court notes that the fact that it was a slow season does not mean that there was *no* business or that Mon River had excess barges available, only that the rate at which it used the barges it had, and the rate at which it would have used the subject barges, was slower than at other times of the year.

34

dispatcher, admitted that Plaintiff had the barge capacity to haul more during the repair period, but did not do so because no customers requested it, but the Court does not find this to be accurate. (Doc. No. 139 at 3).[25] Defendant does point out that Mr. Guttman sent the thirteen barges out for repairs without consulting Mr. Kyle or Mr. Barra, who would have best known whether they were needed at the time, and the Court finds that this was the case. (*Id.* at 4).

Although the Special Master found that "Mon River did not provide any analysis or documentation of its fleet capacity and instead relied upon the testimony of its personnel" and, therefore, concluded that Plaintiff was "[w]ithout proof that Mon River had no excess capacity," the Court declines to adopt the Special Master's finding on this point. While the testimony of Plaintiff's personnel may not meet the Special Master's standards of proof based on the methodology of accounting, it is, indeed, relevant and reliable evidence that Plaintiff had no excess capacity. And, the Court finds that Plaintiff has shown by a preponderance of the evidence that it did not have excess barges available to use in the market that existed. Therefore, the Court also finds that Plaintiff has shown that it would have participated in said market if the subject barges were available.

---

[25]

Defendant provides no citation for this testimony in its pleadings. In its Proposed Findings of Fact and Conclusions of Law (Doc. No. 122 at ¶151), Defendant states "MRT could have loaded more barges and hauled more coal in July had the demand been present" with a citation to the deposition testimony of Mr. Kyle: "(Kyle, 22-23)." Plaintiff does not object specifically to this proposed finding of fact, but Mr. Kyle's deposition testimony does not support this reading. Mr. Kyle explains that miners' vacations accounted for the lower tonnage hauled in July 2004 and that typically Mon River could not use the barges at the mines for other jobs because there was not sufficient time. (Doc. No. 100 at 22-23) In fact, Mr. Kyle testifies that "we were able to take care of the business at hand at that time, but there was use for these barges as soon as they came out of the shipyard" and, when asked "Are you in any position to testify as to what opportunities were available for use of these barges at any time in 2004?" he replied "No, I would not." (Doc. No. 100 at 17-18).

### 4.        Plaintiff's Reasonable Expectation of Profits in Said Markets

### *a.        Plaintiff's Proposed Damages Calculations*

After the breakaway and leading up to and throughout the course of this litigation, Plaintiff has presented a number of different possible calculations of its expected lost profits, each more complex and detailed than the last, largely because of Defendant's repeated insistence that it provide greater detail and substantiation of its demand.  (Exhs. D-3 - D-6, D-8 - D-16).  Each proposed calculation is based on the basic principle that Lost Profits consist of Lost Revenues minus Avoided Costs.

First, Plaintiff presented a calculation of lost profits based on demurrage as follows  (Doc. No. 133-1 at 11-12):

**Demurrage Lost Profits** = (Demurrage Rate - Barge Costs) x (Lost Barge Days)

| Demurrage Rate | $150.00 / day |
|---|---|
| Barge Costs* | $80.71 / day |
| Lost Barge Days* | 1229 |
| **Lost Profits (Demurrage)** | **$ 85,157.41** |
| *\* The basis and calculations of these variables are questioned/analyzed by the Special Master and are discussed below.* | |

Second, Plaintiff presented a calculation for lost profits based on Market Value as follows (Doc. No. 137 at 3-4):

**Market Rate Lost Profits** = (Market Rate - Barge Costs) x (Lost Barge Days)

However, as the Court has determined that Plaintiff has not presented sufficient evidence to establish the level of demand in the pertinent market or to show that said market was available to it at the time, this proposed calculation will not be considered.

36

Third, the calculations presented by Plaintiff for lost profits based on lost opportunity are more complicated.  They are as follows (Doc No. 133-1 at 15, Exh. P-6):

**Lost Opportunity Lost Profits** = (Lost Revenue) - (Avoided Costs)
Lost Revenue = (Average Tons per Load) x (Average Revenue) x (Lost Loadings)
Lost Loadings = (Loads per Barge Day) x (Lost Barge Days)
Avoided Costs = (Boat Costs) + (Barge Costs)

| Lost Revenue | | $420,383.93 |
|---|---|---|
| *Average Tons per Load | | 1,808 |
| *Average Revenue per Ton | | $1.87 |
| Lost Loadings | | 124.3 |
| *Loads per Barge per Day | | 0.101 |
| *Lost Barge Days | | 1,229 |
| **Avoided Costs** | | **$208,576.59** |
| *Boat Costs | $50/ton | $109,384.00 |
| *Barge Costs | $80.71 per Day per Barge | $99,192.59 |
| **Lost Profits (Lost Opportunity)** | (**Lost Revenue** - **Avoided Costs**) | **$211,807.34** |
| *The basis and calculations of these variables are questioned/analyzed by the Special Master and are discussed below.* | | |

All of these calculations depend on the values of the variables that go into them, many of which were analyzed by the Special Master, and the Court addresses them in turn, below.

### b.   *Calculating Lost Profits Damages*

Considering that (1) the subject vessels are jumbo barges, and therefore comparable to other jumbo barges in the market, (2) there was month-to-month volatility in the shipping market, and (3) the subject barges were brand new with very little earnings history before the breakaway, the Court considers the activities and earnings of the rest of Mon River's fleet, especially its other jumbo barges, during the repair period as the best reasonable approximation of the projected activities and

earnings of the subject barges in that same time period.[26]  At trial Mr. Guttman testified as follows:

Q:      Are any two trips that you make identical as far as tonnage and time?
A:      Um, some are, but most are not.
Q:      What differences occur?
A:      All the differences of weather and customer requirements change constantly
        in our delivery mainly because we are only operating within a hundred to 200
        miles of Pittsburgh.
        So there are very many – all the variables that come into play with lock delay,
        with weather delay, with customer issues, with high water, they affect our
        whole fleet all at once all the time.

(Doc. No. 113 at 66-67).  Accordingly, the Court finds that it would be impossible to calculate the

amount of lost profits with exact specificity.  However, the Court finds it reasonable to assume that

these barges would have been loaded at approximately the same rate, carrying approximately the

same tonnage of coal, for approximately the same price as Plaintiff's other jumbo barges at the time.

This is a superior method to Plaintiff's proposed findings based on the rate and tonnage before and

after the repair period but the revenues during the repair period.[27]  Accordingly, the Court adopts its

described method as the most reasonable means of approximating Plaintiff's lost profits and will use

it whenever possible.  Considering the evidence of record and the analysis of the Special Master, the

---

[26]

*See The Conqueror*, 166 U.S. at 127 ("The best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market."); David J. Sharpe & Robert B. Acomb III, *Damages Recoverable in Collision and Stranding Cases*, DAMAGES RECOVERABLE IN MARITIME MATTERS 1, 5 (Robert B. Acomb, Jr. ed., 1984)("Loss of use would ideally be measured by the charter hire for an identical vessel, and this can often be accomplished with barges, but only occasionally with larger vessels."); *Conagra, Inc. v. Inland River Towing Co.*, 252 F.3d 979, 985 (8th Cir. 2001) (finding that average past earnings and/or daily average fleetwide earnings are appropriate methods "when that method appears to be the regular means by which a barge owner tracks its profits.").

[27]

As discussed below, however, when this superior method is impossible, it will not prevent the Court from considering other reasonable methods of making such approximations, including those proposed by Plaintiff.

Court makes the following findings regarding the variables used to calculate lost profits.

### i.      Lost Barge Days

Plaintiff calculated the number of Lost Barge Days as 1,229.  (Exh. P-6).  The Special Master questioned this number (Appendix at 4).  In particular, he determined that the total lost days should not begin at the date of the incident (May 24, 2004) but rather at the date when the barges would have completed their trip and been available for reloading (approximately May 31, 2004). (*Id.*). (This would result in a difference of 92 fewer barge days (7 days x 13 barges).)  He also noted that Barge 423 was returned to service on June 10, 2004, not June 25, 2004, as Plaintiff had claimed. (*Id.*).  (This would result in a difference of 15 fewer barge days.)  In light of the evidence of record, the Court finds this credible and therefore will exclude the month of May, 2004 from its calculations and adjusts the number of Lost Barge Days to account for the earlier return of Barge 423, for a total Lost Barge Days of **1,122**.

### ii.      Average Revenue per Ton

The Special Master examined the Average Revenue per Ton as calculated by Plaintiff, as well.  (*Id.*).  Plaintiff calculated this value at $1.87 per ton, using values for Tons of Coal hauled and Revenue per Ton from May 2004 to October 2004.  (Doc. No. 133-1 at 16).  The Special Master notes that the values for May should not be used, since the barges did not lose any business in May (as discussed above).  (Appendix at 4).  Accordingly, the Special Master recalculated the value as $1.77 per ton.  However, as the Special Master notes elsewhere (*Id.* at 3, n. 4), all but one of the subject barges were returned to service before October, 2004, and the remaining barge was returned to service on October 15, 2004.  Therefore, the Court finds that inclusion of data from that month (which accounts for only 15 of the 1122 lost barge days) would also skew the results, and the Court

will not consider data from October 2004 in its calculations.  Re-calculating this value, excluding May and October, provides an Average Revenue per Ton of $1.89.

The Special Master further states that using an Average Revenue per Ton based on Plaintiff's fleet-wide average revenue per ton during the repair period is inappropriate because it is speculative, since it speculates that the barges would have made the same amount per ton as the other barges in the fleet.  (*Id.* at 4).   However, the Court finds that its re-calculated value is a reasonable approximation of the average revenue per ton.

The Court finds it appropriate to adjust the value accordingly, for a final Average Revenue per Ton of **$1.89**.

### iii.    Average Tons per Load

The Special Master examined Plaintiff's value for Average Tons Per Load, as well.  (*Id.*). Plaintiff claimed that the barges would have averaged 1,808 tons per load if they had been in service, which was the average tons per load hauled by the subject barges between October and December 2004, once they all returned to service.  (Exh. P-25).  The Special Master calls this an assumption with no basis and states that the tonnage the barges would have carried "may be substantially different" and therefore considers it speculative.  (Appendix at 4)  The Court agrees that it seems inconsistent to use values for tonnage carried from after the repair period and values for revenue from during the repair period, especially considering that many of the barges returned to service before the end of the repair period.  A better reasonable approximation of the Average Tons per Load would be calculated from the average tons carried per load by the rest of Mon River's jumbo barges during the repair period.  Unfortunately, Plaintiff did not perform such a calculation, which would have been the optimal means of showing the average loads per ton for these barges.  (Doc. Nos. 113

at 216-18; 114 at 14-15).

Nonetheless, Plaintiff does not need to provide the *optimal* means of showing the value of this variable, so long as Plaintiff provides a *reasonable* means of calculating it.[28]  That being said, Plaintiff does provide such means by other evidence that assists in determining this value: the tonnage carried by the subject barges before the breakaway and after their repairs; the tonnage carried by the rest of the barges in Plaintiff's fleet at the time; and the testimony of its employee, Mr. Barra. Each of these provides some approximation of the Average Tons per Load of the subject barges.

First, as discussed above, Plaintiff provides evidence that the barges carried an average of 1,808 tons per load over 121 loadings once they returned to service, between October and December 2004.  (Exh. P-25).  This can be made a slightly more accurate approximation by also factoring in the average tons per load of the barges on their maiden voyage, before the breakaway, which was 1,666 tons.  (Exh. P-3).  When this figure is factored in, an Average Tons per Load, for the period before and after the breakaway, is arrived at of 1,794.

The Court could also consider the tons per load of the rest of Plaintiff's fleet during the repair period, from June through September 2004.  Plaintiff's Exhibit P-8 indicates that Plaintiff loaded:

>408 barge loads to transport 536,635.31 tons of coal in June, 2004;
>291 barge loads to transport 375,783.20 tons of coal in July, 2004;
>420 barge loads to transport 597,498.56 tons of coal in August, 2004; and
>363 barge loads to transport 506,999.92 tons of coal in September, 2004.

>For a total of 1,482 barge loads and 2,016,916.99 tons of coal.

(Exh P-8). This calculation indicates an average tons per load of 1,360 (2,016,916.99 ÷ 1482).

---

[28]

Defendant had the green sheets showing the tons shipped during the repair period, and it could have performed an alternate calculation to rebut Plaintiff's proposal.

However, the Court is mindful of the fact that this is a fleetwide average and accounts not only for jumbo barges like the subject barges, but also the smaller standard and stumbo barges, which carry less coal per load.

Mr. Barra, Sales Representative for Mon River testified that the new barges "could hold as much as 1,800 tons" while a load for a "standard [barge] is in the neighborhood of nine, 950, and a stumbo is in the neighborhood of 1,100 plus." (Doc. No. 114 at 95). And, he further testified that as new barges came in, he used them to replace standard and stumbo barges, which he then used elsewhere, allowing him to increase the total amount of coal transported by approximately 1,800 tons per new barge. (Doc. No. 114 at 100-06). The Court notes that this estimate is consistent with the loads carried by the subject barges once they returned to service, which varied from 1,634 tons to 2,088 tons. (Exh. P-25).

Considering the above formulas and estimates, the Court finds it reasonable to consider that the Average Tons per Load for the subject barges would have been **1,800.**

### iv.     Loads per Barge per Day

Loads per Barge per Day indicates the rate at which the barges were loaded with coal. The Special Master examined Plaintiff's value for Loads per Barge per Day, and found it too speculative. (Appendix at 5). Plaintiff calculated the Loads per Barge per Day value as 0.101 (approximately one loading every ten days for each barge) based on the rate at which the subject barges were loaded once they returned to service in October through December 2004. (Doc. No. 114 at 15; Exh. P-6). As the Special Master points out, this methodology poses the same problem encountered in the Average Tons per Load calculation above: using the rate of loadings from a busier season to estimate the rate of loadings for a slower season. (Appendix at 5). Therefore, the Court will not simply accept

Plaintiff's value for Loads per Barge per Day.

The Special Master calculated the fleetwide Days per Barge per Load on a monthly basis for the repair period, and his Report shows that Mon River's barges were, indeed, loaded at a slower rate at that time. He found that each of Plaintiff's barges was loaded, on average: once every 13.7 days in June, once every 18.0 days in July, once every 13.1 days in August, and once every 14.2 days in September. (Appendix at 3). This corresponds to a Loads per Barge per Day rate of 0.073 loads per barge day in June, 0.055 loads per barge day in July, 0.076 loads per barge day in August, and 0.070 loads per barge day in September. A weighted average of those rates gives an overall average rate of .068 loads per barge day.[29]

Plaintiff argues that it is improper to use the rate of loading during the repair period to estimate the rate at which the subject barges would have been loaded during that period because it could have secured more business if it had those barges available. (Doc. No. 136 at 55-6). However, the Court finds that since the average *per barge* already accounts for the fact that there were fewer barges available during the repair period, this is a reasonable rate to calculate the rate of loads per barge.[30] Accordingly, the Court finds that a reasonable Loads per Barge per Day value is **0.068**.

---

[29] $$[(.073 \times 30 \text{ days}) + (.055 \times 31 \text{ days}) + (.076 \times 31 \text{ days}) + (.070 \times 30 \text{ days})] / 122 \text{ days} = .068.$$

[30] To put it another way, Plaintiff's argument would have the Court find that, but for the breakaway, Plaintiff would have been able to gain more business, increasing the number of loadings, but would also have the Court ignore the fact that there would be more barges available to service that business. Or, Plaintiff would have the Court imagine that the subject barges would somehow have been loaded more quickly than any other barges at the time. The Court will not do so. The Court does recognize, as Plaintiff argues, that having a critical number of barges (typically 15, enough for a complete tow) allows a towing company to seek more business (Doc. No. 136 at 52-53), but does not find that this is such a significant factor that it seriously hampered Plaintiff's ability to seek business with its barges during the repair period, especially since, as Plaintiff contends, every new barge that came in from May until the end of 2004 went immediately to work (*Id.* at 56),

### v.      Barge Costs

Barge costs are the Plaintiff's expenses for each day it owned the barges. They are not properly part of the Lost Profits analysis, because it is uncontested that Plaintiff incurred these costs and they are part of the out of pocket damages for which Defendant is responsible. Since Defendant is paying these barge costs for the period when the barges were out of service, and since Plaintiff would be paying them otherwise, they are considered an avoided cost and must be subtracted from any lost revenue to calculate Lost Profits. The barge costs per day are made up of the daily rent that Plaintiff was paying to SCF per barge ($75.00) plus the daily cost of insurance per barge ($5.71). The Special Master does not find any fault with this calculation and neither does Defendant. The Court, likewise, finds that a reasonable value for Barge Costs per day is **$80.71**.

### vi.      Boat Costs

Unlike Barge Costs, the value of Boat Costs is highly contested. Boat Costs are another cost avoided by Plaintiff because it was not using the subject barges during the repair period. Boat Costs are the costs of operating Plaintiff's towboats to move barges along the river. Since Plaintiff was not moving the subject barges, it "saved" the corresponding boat costs and they must be subtracted from any finding of lost revenue to determine Lost Profits.

As Defendant points out, Mr. Seiler testified that boat costs are very difficult to calculate with exacting specificity given the number of variables. (Doc. Nos. 114 at 177-80). The Special Master, likewise, found that this calculation was complicated and speculative, and therefore rejected it. (Appendix at 5-6). The Court will not reject the calculations outright, but, mindful of the inherent complexity of the many unknown factors that go into them, the Court will have to satisfy itself with

_____

suggesting that Plaintiff was not holding onto them, waiting to make a complete tow.

a reasonable approximation of this value.

Plaintiff first estimated the Boat Costs at $0.50 per ton, based on a calculation of the costs for operating one of Plaintiff's boats, the M/V Lillian G.  (Doc. Nos. 113 at 139; 114 at 10-12, 134-39; Exh. D-48).  This calculation was an estimate made by Mr. Seiler before the breakaway, in anticipation of a contract where Mon River had planned to use the subject barges.  (*Id.*).  Plaintiff subsequently re-calculated the average boat costs based on the costs to operate five of its boats, the M/V Vulcan, the M/V Sarah S, the M/V Rose G, the M/V Howard Guttman, and the M/V Lillian G.  (Doc. No. 114 at 134-39; Exh. P-27).  These boats are representative of Mon River's different classes of boats, based on their size and horsepower, excluding the smaller harbor boats. (Doc. No. 114 at 137).  The smaller harbor boats were not included because they would not be involved in Plaintiff's use of the subject barges and because their operating costs were lower than the other classes, such that including them would have decreased the average boat cost calculation even further.  (*Id.* at 137-38).  The re-calculated value of average boat costs was $0.36 per ton.  (Exh. P-27).[31]  Accordingly, the Court finds that a reasonable estimate of Average Boat Costs per ton was **$0.36**.

### vii.    The Court's Calculations of Plaintiff's Reasonable Expectation of Profits

The Court, therefore, finds that the most reasonable available values to use for the various calculations of lost profits are:

---

[31]

This calculation involved a number of variables, including the average miles per route during the repair period, and the average tons per tow.  (Exh. P-27).  Some of these may be subject to adjustment (e.g. the the average miles per route includes data from October 2004 and the average tons per tow should be 1800 rather than 1808, *see supra*), but the Court finds that the effect of such adjustments would be de minimis.

| | |
|---|---|
| Demurrage per Day | $150.00 |
| Lost Barge Days | 1122 days |
| Average Revenue per Ton | $1.89 |
| Average Tons per Load | 1800 tons |
| Loads per Barge per Day | 0.068 loads |
| Barge Costs per Day | $80.71 |
| Boat Costs per Ton | $0.36 |

Using the equations discussed *supra* with these values, the Court finds that there are two possible means of calculating Plaintiff's lost profits damages:

**Demurrage Lost Profits** = (Demurrage Rate - Barge Costs) x Lost Barge Days
Demurrage Lost Profits = [($150.00 - $80.71) x 1122] = <u>$77,743.38</u>

**Lost Opportunity Lost Profits** = Lost Revenue - Avoided Costs
        Lost Revenue = (Average Tons per Load) x (Average Revenue) x (Lost Loadings)
                Lost Loadings = (Loads per Barge Day) x (Lost Barge Days)
        Avoided Costs = Boat Costs + Barge Costs
Lost Opportunity Lost Profits = $259,572.60 - $139,999.02 = <u>$ 119,573.58</u>
        Lost Revenue = (1800) x (1.89) x (76.3) = 259,572.6
                Lost Loadings = 0.068 x 1122 = 76.3[32]
        Avoided Costs = (0.36 x 1800 x 76.3) + (80.71 x 1122) = 139,999.02

An admiralty court need only adopt a methodology that allows it to ascertain lost profit damages to a reasonable certainty. *ConAgra, Inc. v. Inland River Towing Co.*, 252 F.3d at 985 (8th Cir. 2001). And, while the Court is convinced that both of these methods are reasonable, it finds that the method based on Lost Opportunity best captures the complexities of the trade in which the barges would most likely have been used, but for the breakaway. Demurrage can vary from contract to contract, and the Court has no information beyond the single datum point of the contract these barges

---

[32] The value of 76.3 is rounded from 76.296.

were under at the time of the breakaway, to which Industry was not a party.   Accordingly, the Court adopts the Lost Opportunity method and finds that Plaintiff suffered lost profit damages of **$119,573.58**.

### 5.    Prejudgment Interest and Total Damages

The Court has found that Plaintiff suffered $364,257.53 in out of pocket damages and $119,573.58 in lost profits damages.  Accordingly, the Court finds total damages of $483,831.11.

Defendant has already paid a portion of these damages.  Specifically, Defendant has already paid $212,431.00 toward the repair and transportation costs.  (Doc. No. 114 at 128; D-7).  A total of $271,400.11 therefore, remains unpaid.[33]

In admiralty suits, courts have traditionally awarded prejudgment interest on any damages. *City of Milwaukee v. Cement Division, National Gypsum Co., et al*, 515 U.S. 189, 195 (1995).  Such an award is part of ensuring that the injured party is fully compensated for its loss, and is not punitive.  *Id.*; *In Re Bankers Trust, Co.*, 658 F.2d 103, 108 (3d Cir. 1981). A court has discretion to award or deny prejudgment interest, but the "rule in admiralty is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable." *In Re Bankers Trust, Co.*, 658 F.2d at 108.  "Generally, exceptional circumstances exist only when the district court concludes that the party requesting interest has (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3)

---

[33]    The $212,431.00 paid by Defendant was based on its surveyor's estimate of the transportation repair costs.  Defendant, through Mr. Kula, offered an additional sum of $22,033.00 on August 2, 2005, essentially splitting the difference between their current positions on repair and transportation costs, as a full and final settlement.  (Doc. No. 112 at 51-54).  Plaintiff refused the offer because it did not account for lost profits damages, which Defendant was still contesting.  (*Id.*)

not sustained any actual damages." *Id.* The Court does not find that any of these pertain in the instant case or that any other circumstances warrant denying an award of prejudgment interest. Accordingly, an award of prejudgment interest is appropriate.

The average prime interest rate from May 2004 to date was 6.27%, which the Court considers a reasonable rate for calculating prejudgment interest. (Exh. P-9). The Court finds that interest at that rate on $271,400.11, compounded annually from May 22, 2004 until the present,[34] amounts to $115,487.02, which sum is properly added to the total damages owed.

The total damages due and owing, including prejudgment interest, therefore, become **$386,887.13**.

E.      **BAD FAITH AND ATTORNEYS' FEES**

In admiralty cases, attorneys' fees are not typically awarded unless the court finds in its equitable discretion that one party acted in bad faith. *Vaughan v. Atkinson*, 369 U.S. 527 (1962); *Sosebee v. Rath*, 893 F.2d 54, 56 (3d Cir. 1990). Bad faith in admiralty is an equitable concept, without a simple definition. *Id.* Courts have found bad faith when a party acts with "callous disregard and indifference" toward the other party. *Delaware River Tow, LLC v. Nelson*, 382 F.Supp.2d 710 (E.D.Pa. 2005). In *Vaughan*, the United States Supreme Court said that it was "difficult to imagine a clearer case of" bad faith than when the defendants were "callous in their attitude, making no investigation of [plaintiff's] claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, [plaintiff] was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old." 369 U.S. at 530-31.

---

[34]     The period from May 22, 2004 to March 22, 2010 is 5.83 years, the value used by the Court for this calculation.

The Court finds that Defendant has acted in bad faith in multiple ways, in multiple aspects of this litigation.  First and foremost, Defendant has contested liability to the present day, despite knowing early on that it was liable for the breakaway.  Secondly, the nature of certain evidence and the manner of its production by Defendant gives rise to a strong inference that evidence was deliberately withheld.  Third, the testimony of Defendant's representatives – Mr. Bartley, Mr. Busatto, and Mr. Kula – at trial, was marked by self-serving inconsistencies which lead this Court to find each of them lacking in credibility.[35]

1.      **Defendant Demonstrated Bad Faith by Continuing to Contest Liability, Despite Knowing That It Was Liable**

Industry's insurer, International Marine Underwriters, through Mr. Kula, directed the investigation of the breakaway, supervised Mr. Moran's surveying work, and undertook the direction of the subsequent negotiations and litigation.[36]  (Doc. No. 111 at 154-56).  Mr. Kula acted throughout as an agent of Defendant.[37]  In this Court's estimation, Defendant and its agent Mr. Kula, knew soon

---

[35]

As the trier of fact, this Court makes determinations of credibility.  *See Petition of J.E. Brenneman Co.* 322 F.2d 846, 852 (3d Cir. 1963) (commenting, in an interlocutory appeal from the district court's findings and conclusions that "the failure of the petitioner . . . to have a watchman all night [on barges which caught fire] may be regarded as negligence," that "[t]his appeal presents vigorous attacks upon the findings of fact by the District Court.  We need not stress the elementary rule that the credibility of the witnesses is for the trier of fact and that the findings of the Trial Judge are not to be disturbed by this court unless they are clearly erroneous.") (citing *McAllister v. United States*, 348 U.S. 19 (1954)).

[36]

Henderson Brothers, Industry's insurance broker, handled the claim initially, after being informed of the breakaway by Industry, and hired the investigator, marine surveyor, and Industry's counsel, but almost immediately turned control over to International Marine Underwriters and Mr. Kula.  (Exh. C-1, Letter with enclosures of May 26, 2004 from Bruce Marshall to Tom Kula.).

[37]

"Under Pennsylvania law . . . an insurance contract provides not only for indemnity, but also 'operates at the same time to create an agency relationship in its provision for the insurer's exercise of control over the disposition of claims against the insured . . . whether that be by settlement or

after the breakaway that Industry was responsible for the accident, but continued to contest liability and forced Plaintiff into protracted litigation, including three rounds of mediation and trial, without conceding the issue. In short, Plaintiff was "forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old." *Vaughan*, 369 U.S. at 530-31.

Defendant and its insurer knew of the presumption of liability for a bailee under admiralty law, and of the Defendant's inability to rebut it.[38] (Doc. No. 112 at 84, 96). But, they proceeded to contest liability nonetheless, and do to this day.

Defendant produced no credible evidence to support any alternate theory as to why the barges broke loose, such as an 'inevitable accident,' and it knew long before trial that the few alternate theories that it chose to present were not viable. Mr. Busatto, for instance, testified that he initially thought that the poly line used to secure the barges was in some way defective. (Doc. No. 110 at 150). However, Mr. Kula testified during trial that the line was never tested, and there is no evidence, beyond Mr. Busatto's initial supposition, that the line was defective in any way. (Doc. No. 112 at 97). Mr. Kula explained that he decided not to test the line because he understood that it had not been the first to fail, but rather that the steel cable securing the barge snapped first, so that a

---

litigation." *Jamison v. Miracle Mile Rambler, Inc.*, 536 F.2d 560, 562 (3d Cir. 1976). "Because there is no established federal admiralty rule on agency, state law governs agency determinations." *Yu v. Albany Ins. Co.*, 281 F.3d 803, 811 (9th Cir. 2002); *see also Windsor Mt. Joy Mut. Ins. Co. v. Pozzi*, 832 F.Supp. 138 (E.D.Pa. 1993)("Because it does not appear that any federal statute or established rule of maritime law governs the interpretation and construction of contracts for marine insurance, state law controls these issues.").

[38]

In addition to Defendant being represented by counsel of record in this matter, Mr. Busatto was individually represented and counseled by his son, Max Busatto, Esq., an attorney at Dickie, McCamey & Chilcote, P.C. with experience in admiralty/maritime law. And, Mr. Kula had in-house counsel available from his parent company, though he testified, remarkably in this Court's estimation, that "we find them not very effective" and that he did not consult them regarding the damages issues in this matter. (Doc. No. 112 at 119-20).

failure in the poly line could not be the cause of the breakaway.  (*Id.* at 98).  However, as Mr. Kula and Defendant well knew, the steel cable was also Industry's rigging equipment and Industry bore the responsibility for maintaining it in a condition that would not allow the barges to break away.  (*Id.*; Doc. No. 110 at 94).  Thus, Mr. Kula's belief that the cable failed, rather than the line, does not suggest a lack of liability but rather points squarely at Industry's liability for the breakaway.

Similarly, Mr. Busatto testified that they were anticipating higher water than normal at the time of the breakaway.  (Doc. No. 110 at 13-16).  The gauge readings from the Montgomery Lock and Dam support his testimony, and the water did rise overnight before the breakaway.  (Exh. J-1).  Defendant also presented evidence that the Montgomery Lock and Dam opened its gates fully, shortly before the breakaway.  (Doc. Nos. 110 at 109-110; 111 at 42).  But, as Defendant knew early on, none of this evidence amounted to a viable defense on the issue of liability.  Factually, as discussed above (and according to Defendant's own witnesses Mr. Busatto and Mr. Bartley, and Mr. Bartley's report to the Coast Guard), any surge in the water level caused by opening the dam did not reach the barges by the time of the breakaway and could not be a factor in the breakaway.  (Doc. Nos. 110 at 108-11; 111 at 42, 71-73; Exh C-1).  And, legally, as testified to by Mr. Kula, "[m]ere high water does not absolve the fleeter." (Doc. No. 112 at 100).  Nonetheless, despite knowing that any rise in the water level was neither the factual nor the legal cause of the breakaway and that it could not rebut the presumption of negligence, Defendant continued to present evidence regarding same and to imply its relevance to the question of liability throughout, and even after, trial.  (*See* Doc. No. 122 at ¶¶ 48-50).

In short, Defendant has presented no credible alternate theory to explain the breakaway and had no credible evidence with which to mount a good faith rebuttal of the presumption of negligence.

Even ignoring the presumption of liability for a bailee, Defendant has not presented credible evidence to show that it met a standard of reasonable care.[39]  To the contrary, the evidence presented at trial establishes that, at least as early as February of 2005, Mr. Kula determined that the standard of care had not been met.  Based on the advice of the retained investigator,[40] he wrote that "operational negligence in the handling of the fleet and its lines played a large part in the breakaway."  (Exh. C-1, Email of February 22, 2005 from Thomas F. Kula to Bruce C. Marshall; Doc. No. 112 at 82).  Mr. Kula communicated this analysis to Mr. Marshall of Henderson Brothers, Defendant's insurance broker, on February 22, 2005, evidently expressing hopes of enlisting other insurers in payment of the claims[41] (Doc. No. 112 at 34, 83-83), but at that same time he was reserving his rights regarding liability when communicating with Plaintiff. (Doc. No. 111 at 161-62, 167-69).  Even if this was the result of confusion at the time – if, for instance, Mr. Kula was unaware

---

[39]

The Court notes that Defendant has consistently argued against the application of the *Louisiana* presumption, despite Mr. Kula's acknowledgment that he knew that it applied.  (Doc. No. 112 at 84, 96).  At the motion for summary judgment stage, Defendant argued that the facts of record did not establish the existence of a bailment, though that contention was, in this Court's words, "belied by Defendant's own admissions in its answer to Plaintiff's complaint." *Mon River Towing, Inc. v. Industry Terminal and Salvage Co.*, 2009 WL 904701, at 5 (W.D.Pa., Mar. 31, 2009).  In its pre-trial brief, at trial, and in its post-trial filings, Defendant advanced the baseless argument, as discussed above, that the *Louisiana* presumption should not apply since the arrangement was a bailment for mutual benefit, rather than a bailment for hire.  (Doc. Nos. 102 at 2-3;115 at 2-3).  *See supra* n. 9.

[40]

Any actual report made by this investigator or Mr. Kula's notes of a verbal report, despite their obvious probative value on issues of liability, were not produced by Defendant.  Mr. Kula's email, based on said report, was only produced belatedly, as described below.

[41]

International Marine Underwriters evidently paid claims from various third parties who were also injured by the breakaway, for damage to other barges involved in the breakaway, for damage to a stern wheel vessel downriver, and possibly others.  (Doc. No. 112 at 115-16).

that the "operational negligence in the handling of the fleet and its lines" was attributable to the actions of Industry's personnel and the M/V Ranger (*See* Doc. No. 112 at 82) – Defendant continued to contest liability even once it became quite clear whose boat had handled the barges.  (Doc. No. 112 at 96).

The Court notes that on February 22, 2005, the same day that Mr. Kula emailed Mr. Marshall that "operational negligence in the handling of the fleet and its lines played a large part in the breakaway," he informed Mr. Guttman that he was prepared to authorize payment for the repairs, but denied that doing so was an admission of liability.  (Exh. C-1, Email of February 22, 2005 from Thomas F. Kula to Bruce C. Marshall; Doc. No. 111 at 161-62, 167-69).  On March 2, 2005, Mr. Kula sent a fax to Mr. Guttman regarding payment for repairs and lost profits, and he testified at trial that one reason he was not making that payment at that time was because they "had not made a determination on liability." (*Id.* at 163-64).

Mr. Kula did in fact authorize a payment of $212,431.00 to partially reimburse Mon River for repairs, which payment was made on April 13, 2005, though continuing to reserve the right to contest liability. (Exh. D-7; Doc. No. 111 at 166-67).  The letter accompanying the April 13 payment stated, in part:

> The payment is toward settlement of a claim for which our assured's liability is disputed.  It is entirely without prejudice to any rights and defenses available to our assured, and should not be construed as an admission of liability or as an agreement to the quantum of his claims.  All such rights and defenses are reserved.

(Exh. D-7).  At trial, Mr. Kula testified that the payment was not an admission of liability, but also that "[t]his is what we agreed we owed.  There is no point in withholding payment of that amount while we hash out the differences of opinion."  (Doc. No. 111 at 168-69).

In this Court's estimation, upon an examination of the communications between Mr. Kula

and Plaintiff (Exh. C-1), those "differences of opinion" were almost exclusively regarding the proper calculation of damages, not the question of liability.  The vast majority of the correspondence and documentation produced to the Court concerned the demand for, calculation of, and proof required for damages.  (*Id.*).  For instance, in two letters, to Mr. Guttman on August 2, 2005 and to Plaintiff's counsel on December 6, 2005, Mr. Kula asks repeatedly for more information to establish a lost profits damages claim and contends that wheelabrated steel need not have been used for the repairs, but in neither one does he indicate any basis for contesting liability or any ongoing investigation of it, despite repeatedly reserving his rights on the issue.  (*Id.*, Letter of August 2, 2005 from Thomas Kula to James Guttman, Letter of December 6, 2005 from Mr. Kula to Wood & Lamping LLP).

Further, Mr. Kula authorized and paid for claims by third parties who were injured by the breakaway.  (Doc. No. 112 at 115-16).  According to Mr. Kula's testimony, International Marine Underwriters reserved its rights on all or most of these claims.[42]  (*Id.*).  While continuing to contest liability with Plaintiff, Mr. Kula still authorized payment to Plaintiff for repairs and settled claims from third parties.  Nonetheless, the evidence of record indicates that Mr. Kula was remiss in the effort he applied both to investigating liability and in timely settling Plaintiff's claim.[43]  For instance,

---

[42]

The documentation in Mr.Kula's claims file regarding these payments was not produced to the Court or Plaintiff, defense counsel arguing that said information was irrelevant.  This Court does not agree.

[43]

In determining whether Mr. Kula, an agent of Industry, acted with callous disregard or indifference, the Court is guided not only by the equitable principles of bad faith in admiralty law, but also by Pennsylvania's laws outlining the duties owed by an insurer in handling claims.  For instance, Title 40, Section 1171.5 of the Pennsylvania Unfair Insurance Practices Act lays out practices that an insurer should avoid, and it specifies, in relevant part, that:

> (10) Any of the following acts if committed or performed with such frequency as to indicate a business practice shall constitute unfair claim settlement or compromise

practices.

. . . .

(ii) Failing to acknowledge and act promptly upon written or oral communications with respect to claims arising under insurance policies.

(iii) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

(iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information.

(v) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the company or its representative.

(vi) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

(vii) Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.

(viii) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application.

. . . .

(xii) Delaying the investigation or payment of claims by requiring the insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

(xiii) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage or under other policies of insurance.

(xiv) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

40 P.S. § 1171.5. Similarly, Title 31, Pt. VIII, Ch. 146 of the Pennsylvania Insurance Code describes unfair claims settlement practices and sets forth the standards for prompt investigation of claims and for prompt, fair and equitable settlements.  PA Code § 146.  In this Court's estimation, this statute and corresponding code section establish both the duties an insurer owes to its insured, and the duties of an insurer, acting as an agent of the insured, to a claimant.  *See Jamison*, 536 F.2d at 562 (3d Cir. 1976).  As the Court noted at trial, the Pennsylvania Unfair Insurance Practice Act is based on a model insurance statute, and undoubtedly Mr. Kula was aware of its import and was trained by International Marine Underwriters to conform to it. (Doc. No. 112 at 138-40).

In many other respects, the Court finds Mr. Kula's handling of this matter to be lacking, including the facts that he did not consult with his in-house counsel regarding the merits of the legal

55

Mr. Marshall of Henderson Brothers, Industry's insurance broker, wrote to Mr. Kula on January 28, 2005 that "the breakaway claim is also being dragged out.  You should have all the reports from all entities involved in this claim along with claimant's proof of loss statements.  I am also receiving daily calls on this unpaid claim.  Please respond and see to it that these claims are paid as soon as possible."  (Exh. C-1, Email of January 28, 2005, from Bruce C. Marshall to Thomas F. Kula).  In short, Defendant contested liability despite ample evidence in its possession that it was liable, despite payments to others suggesting its acceptance of liability, and despite significant pressure to resolve the matter expeditiously, including a legal duty to do so.

Even during trial and afterwards, Defendant has continued to dispute liability with no credible basis in evidence for doing so.  At trial, Mr. Kula testified that he had never reached a conclusion on the issue of liability (Doc. No. 112 at 83), which this Court finds remarkable considering his level of experience, the investigation and discovery in this case, and his duty to promptly and fairly adjust the claim.  When asked at trial why he was not able to resolve the claim earlier, Mr. Kula replied "[s]imply because we never received any documentation at all to substantiate the loss of use claim" and made no mention of the issue of liability, but nonetheless Defendant continued to deny same. (*Id.* at 72).  And, even after trial, in its Proposed Findings of Fact and Conclusions of Law, Defendant sought to use his admitted lack of a conclusion as a basis for contesting liability once again.  (Doc. No. 128 at ¶39).

---

claims, he did not attempt to ascertain the state of the market for barges during the repair period, he did not submit the evidence of lost profits supplied by Plaintiff to an accountant for analysis, and he did not attend the entirety of the trial to ascertain the credibility or forthrightness of Defendant's witnesses.  (*Id.* at 130-40).  The Court makes no determination as to whether Mr. Kula breached his duty to Industry, as the only question before the Court is Industry's lack of good faith in dealing with Mon River.  That question may be left for another day.

In its post-trial submissions, Defendant responded to Plaintiff's proposals regarding liability by discussing damages disputes. For example, Plaintiff proposed the following finding of fact: "During the course of this litigation, [Industry] and Mon River were involved in three mediations. At no time during any of these mediations did [Industry] either concede liability or increase its settlement offer above $22,033.00." (Doc. No. 121 at ¶95, citing Doc. No. 112 at 89, 102). Defendant replied, "Disputed. To the contrary, [Industry] and its representatives always remained willing to negotiate and to consider resolving this claim, . . . but [Mon River] never presented during the mediations any documents or evidence justifying the loss of use claim. [(Doc. No. 112 at 89)]."[44] (Doc. No. 128 at ¶95). Defendant ignored Plaintiff's contention that it should have conceded liability and focused once again on damages questions, which seems to have been its modus operandi throughout.

In sum, Defendant, through its agent, Mr. Kula, through its counsel, and through its employees (*see* below), continued to contest liability for over five years, although all credible evidence pointed to the conclusion that Industry was liable and despite the fact that Defendant knew as much, soon after the incident occurred. To this day, Defendant has not acknowledged liability, and at trial Defendant moved frivolously for judgment as a matter of law on the issue at the close of Plaintiff's case-in-chief and renewed that motion at the close of its own case, despite having no basis

---

[44]

Defendant also responded that any discussions or negotiations conducted in mediation are confidential and not admissible for any purpose. The Court agrees. *See* W.D.Pa. Alternative Disp. Resol. Pol'y and Proc. § 6, *available at* http://www.pawd.uscourts.gov/Applications/pawd_adr/ Documents/ADR_Policy_and_Prodedures.pdf. However, Plaintiff's point applies to all settlement negotiations and relies upon unobjected-to trial testimony. At no point, within mediation and settlement negotiations or without, did Defendant concede liability to this Court's understanding, even to this date.

in law or fact to support doing so.   Had Defendant abandoned its baseless liability defense and

stipulated to liability at any point before trial, the expense to both parties would surely have been

lessened.[45]  Moreover, as detailed below, certain evidence that Defendant possessed since soon after

the breakaway, but that was only belatedly produced to Plaintiff and the Court, further demonstrates

its liability.  Continuing to contest its liability when it was clearly established, and forcing Plaintiff

to litigate the question, constitutes bad faith.

### 2.      Defendant Demonstrated Bad Faith by Withholding Evidence Regarding Liability

The Court is more than troubled that certain evidence which came to light only in the final

stages of the bench trial was not produced earlier by Defendant and that the evidence that was

produced still appears incomplete.  And, it has not escaped the Court's attention that said evidence

is highly probative of, and damaging to, Defendant's position regarding liability.

Mr. Kula's claims file – including the second logbook page as well as the report and

statement to the Coast Guard which contradict Mr. Bartley's trial testimony[46] – was not produced to

Plaintiff's counsel until the eve of the last day of trial (Doc. Nos. 111 at 176-82, 112 at 1-20), when

Mr. Kula was already testifying, even though Defendant had long been contesting liability and

---

[45]

The Court of Appeals for the Third Circuit has recognized that "parties who employed the legal process 'primarily intending to increase the burden and expense of litigation to the other side' might be liable for abuse of process."  *In re Finney*, 184 Fed.Appx. 285, *3 (3d Cir. 2006) (quoting *Gen. Refractories Co. v. Fireman's Fund Ins. Co.* 337 F.3d 297, 308 (3d Cir. 2003)).  The Court makes no finding as to whether Defendant's primary intent was to increase the expenses of litigation; but the Court does consider it a factor in its bad faith analysis that Defendant's refusal to stipulate to liability had that entirely foreseeable consequence.

[46]

*See* Section III.B.1, *supra* and III.E.3, *infra*.  Defendant's counsel avers that the statement to the Coast Guard was produced as part of the informal discovery process in this matter, but Plaintiff's counsel avers that they had not seen it before it was produced at trial.  (Doc. No. 112 at 16-18).

defending against the claim of bad faith.  The file was subject to FED R. CIV. P. 26(a)[47] mandatory

initial disclosure and responsive to a number of Plaintiff's discovery requests[48] (Exh. D-51; Doc. No.

112 at 6-9), and Defendant had a continuing duty to supplement its discovery under FED R. CIV. P.

26(e).[49]   In this Court's estimation, the documents in a claims file reflect the investigation and

---

[47]

In 2006, when this suit began, FED R. CIV. P. 26(a) provided, in relevant part:

**(a) Required Disclosures; Methods to Discover Additional Matter.**
**(1) Initial Disclosures.** Except in categories of proceedings specified in Rule 26(a)(1)(E),
or to the extent otherwise stipulated or directed by order, a party must, without awaiting a
discovery request, provide to the other parties:
. . . .
(B) a copy of, or a description by category and location of, all documents, data compilations,
and tangible things that are in the possession, custody, or control of the party and that the
disclosing party may use to support its claims or defenses, unless the use would be solely for
impeachment.

FED R. CIV. P. 26(a) (2006).

[48]

*See* Doc No. 112 at 6-10 ("There are numerous requests, at least in this Court's reading and
understanding, that would require inquiry of the claims adjuster, to secure the claims adjuster's file
at the very outset, and particularly in light of the specific requests for production, whether discovery
is formal or informal in this case."); *see also, e.g.*, *Andrews v. Bureau of Codes Administrative
Office*, Civ. A. No. 08-1669, 2010 WL 773905 (M.D.Pa. Mar. 2, 2010) (cautioning the defendant
city not to read discovery request narrowly and instructing it to order its inspectors to search their
own files for responsive documents, even though the defendant city did not maintain said files itself).

[49]

In 2006, FED R. CIV. P. 26(e) provided in relevant part:

**(e) Supplementation of Disclosures and Responses.**   A party who has made a
disclosure under subdivision (a) or responded to a request for discovery with a
disclosure or a response is under a duty to supplement or correct the disclosure or
response to include information thereafter acquired if ordered by the court or in the
following circumstances:
. . . .
if the party learns that in some material respect the information disclosed is
incomplete or incorrect and if the additional or corrective information has not
otherwise been made known to the other parties during the discovery process or in
writing.

conclusions of Defendant's agent regarding liability and damages.  They are, therefore, probative of the question of bad faith, and quite properly part of discovery, but they were not produced until Defendant was compelled to do so during trial.[50] (Doc. No. 112 at 4, 10-11).

The Court also finds that the portion of Mr. Kula's claims file belatedly produced to Plaintiff and the Court (Exh C-1) is inadequate at best.  It does not reflect the type of effort with which an insurer should adjust a claim, much less the diligence with which a defendant, who intends to contest liability, should investigate an accident.  Mr. Kula testified that it was the complete claims file, except for any privileged documents and records related to claims paid to third parties as a result of the breakaway.  (Doc. No. 112 at 43).  Given the age of the claim, investigation, discovery, and litigation, this Court finds this hard to believe.  It contained a copy of the Comprehensive Marine Liability Policy issued to Industry.  (*Id.*).  It also included copies of correspondence (emails, faxes, and letters) between Mr. Kula and numerous parties, including: Mr. Marshall at Henderson Brothers (Industry's insurance broker); Industry's representatives, including Mr. Busatto and Industry's counsel; Mon River's representatives, including Mr. Guttman and Mr. Seiler, providing invoices for Mon River's costs and seeking payments for repairs and lost profits damages; Mon River's counsel, regarding the investigation and negotiations regarding damages; and a handwritten notation, evidently from someone at International Marine Underwriters checking on the resolution of the

---

FED R. CIV. P. 26(e) (2006).

[50]

Furthermore, other documents that Defendant could have obtained were constructively in its possession, custody, and control, such as files from Henderson Brothers and Passant & Passant. Those documents would have also been responsive to Plaintiff's requests and should have been produced. FED. R. CIV. P. 34(a). *See In re Sunrise Securities Litigation*, 109 B.R. 658, 661 (E.D.Pa. 1990); *see generally* Wright & Miller, 8 FEDERAL PRACTICE AND PROCEDURE § 2210, pp. 620-626.

matter.  (*Id.*).  It also contained records of checks paid to Merrill Marine Services for Mr. Moran's

survey of the damaged barges; invoices from and checks paid to an insurance investigator, Passant

& Passant Ltd.; and invoices and a fax from Frank Winne & Son, Inc. regarding the manufacture of

the poly line purchased from it, that Defendant initially suspected was involved in the breakaway.

(*Id.*).  There were also records of Mon River's daily logs for its entire fleet from May 20, 2004 to

May 24, 2004, produced by Plaintiff to show that the fleet was fully engaged at the time of the

breakaway, but no record of any analysis by Defendant or Mr. Kula of same.[51]  (*Id.*).  It also

contained the report and statement supplied to the Coast Guard by Mr. Busatto; gauge readings from

the Montgomery Lock; Industry's records, including the logbook entries for the M/V Ranger and a

Fleet Report for the dates of the breakaway; and pictures of the damaged barges. (*Id.*).

The Court notes that numerous items one would expect to find were missing from the claims

file as it was eventually produced.  For instance, the claims file contained invoices and records of

checks for $2,570.20 and $856.05 to Passant & Passant Ltd., indicating extensive investigations

performed over the course of 41 hours between May 24, 2004 and July 30, 2004.  (Exh C-1, Invoices

from Passant & Passant, Ltd.; Checks to Passant & Passant, Ltd.).  The invoices indicate that during

the course of Passant & Passant's investigation, in addition to interviewing many witnesses, the

investigator contacted the Coast Guard on June 6, 2004 to obtain a copy of its investigative report

(though it is unclear when, if ever, it was actually obtained), and the investigator obtained the poly

line for testing, which was to be arranged by Defendant's counsel but was never performed.  (*Id.*).

However, the file contains no report from Passant & Passant, Ltd. and no notes or other indication

---

[51]

Defendant responded, and continues to argue, that the records of the fleet during this limited
time do not shed any light on its availability throughout the subsequent repair period.  (Exh. C-1).

of the results of the investigation, even though said investigation apparently formed the basis of Mr. Kula's statement that "operational negligence" was behind the breakaway. (Doc. No. 112 at 31-2; Email of February 22, 2005 from Thomas F. Kula to Bruce C. Marshall). Most importantly, the claims file contains almost no evidence that would form a reasonable basis for Defendant to honestly contest liability in good faith. As noted above, the majority of the correspondence focuses on the calculation of damages. And, while agreeing to pay for a substantial portion of the repairs, Mr. Kula repeatedly reserves his rights as to liability, despite lacking any foundation for honestly doing so. It also contains evidence, as described above, that others, including Henderson Brothers, Industry's broker, felt that the claim was being dragged out. In this Court's estimation, the portion of the file as produced, even considering redactions for attorney/client privilege and attorney work product, supports the Court's conclusion that there was no good faith basis to continue defending on liability.

Mr. Kula's claims file was not the only documentation that Defendant produced for the first time late during trial. On the morning of the last day of trial, Defendant's counsel informed the Court that, shortly before trial, Mr. Busatto had mentioned that there may be a second page to the logbook of the M/V Ranger for May 22, 2004, the date of the breakaway. (Doc. No. 112 at 17-18). Later, once the issue of Mr. Kula's missing claims file had come to light, Defendant's counsel thought to ask Mr. Busatto for that page (Exh. P-29), and it was finally produced to Plaintiff and the Court with the claims file on that last day of trial. (*Id.* at 18-20). The Court notes that this "second page" of the logbook overlaps with the originally produced pages (Exh. P-28), one covering the time from 7:00 a.m. to 4:00 p.m. and the other from noon to 11:00 p.m. The Court finds it indicative of bad faith that: the second page of the logbook was not produced earlier, that two different, contradictory logbook entries exist covering the same vessel for the time period; and that the two logs contradict

62

each other and Mr. Bartley's trial testimony.

Accordingly, the Court finds that Defendant proceeded in bad faith in at least two ways: by withholding evidence that should have properly been part of early disclosure, discovery, and pretrial proceedings,[52] and by continuing to contest liability despite its knowledge and evidence in its possession indicating that there was no basis for doing so.

### 3.   Defendant Demonstrated Bad Faith by Presenting Self-Serving, Inconsistent, Trial Testimony that Lacked Credibility

Finally, the Court notes that, as discussed above in Section III.B.1, the trial testimony of Mr. Busatto and Mr. Bartley regarding liability was far from consistent and lacking in credibility.  Their testimony on the inspection of the barges, the handling of the M/V Ranger, and their attempts to deal with the fouled line contradicted their previous statements in their depositions, the records in the vessel's logbook(s), as well as Mr. Bussato's report and Mr. Bartley's statement given to the United States Coast Guard at the time of the breakaway.  (Doc. Nos. 110 at 58-59, 137-38, 147; 111 at 61-62, 69; 112 at 110-14; Exh. C-1, Report to USCG).  The lack of credibility of these witnesses and the self-serving nature of their testimony, along with the discrepancies between their trial testimony and the evidence which had been withheld, also cast grave doubt on Defendant's good faith in continually contesting liability.

---

[52]

*See* Doc. No. 59, this Court's Pretrial Order, directing the parties to confer regarding exhibits and to exchange and mark same before trial.  This Court also held an Exhibit Hearing (Doc. No. 77) at which said exhibits could have been presented.

####     4.     Conclusion as to Bad Faith

Defendant, through the actions of its employees, insurance representative, and possibly its counsel,[53] has acted with "callous disregard and indifference," *Delaware River Tow, LLC v. Nelson*, 382 F.Supp.2d 710 (E.D.Pa. 2005), to the facts of this case and to the Plaintiff: by insisting for over five years that it had a defense to liability, when, in fact, it lacked any credible evidence to rebut the presumption of negligence, and when Defendant and its insurance carrier were well aware of Defendant's liability early in the litigation process; by withholding documents that were highly probative of, and detrimental to Defendant's position on, liability; and by testifying inconsistently and perhaps falsely at trial regarding liability.

Accordingly, the Court finds that Defendant has acted with bad faith both in the investigation and the litigation of this matter.  In so doing, it has thwarted the very purposes laid out for this Court, to ensure "the just, speedy, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1.  Its callous disregard and indifference to Mon River forced it to "hire a lawyer and go to court to get what was plainly owed [to it] under laws that are centuries old." *Vaughan v. Atkinson*, 369 U.S. 527, 530-31 (1962).  The Court, therefore, will entertain a motion by Mon River seeking all attorneys' fees and costs related to investigating and litigating the issues of bailment and liability, in an amount to be determined.

#### F.     PUNITIVE DAMAGES

In its post-trial submissions, Plaintiff proposes that this Court impose punitive damages on Defendant for its conduct in this matter.  (Doc. No. 121 at ¶¶156-57).  As Defendant correctly

---

[53]

An attorney has a duty to act as a competent and forthright counselor to his client and a duty of candor to the court. PA. R. PROF. COND. §§ 1.1, 1.3, 1.4, 3.3.

responds, this is the first time that Plaintiff has formally asserted a request for punitive damages before this Court, and special damages must normally be specifically pleaded and stated, FED. R. CIV. P. 9(g), so Defendant argues it had no notice that they would be sought.  (Doc. No. 128 at ¶¶156).  Accordingly, the Court will not award punitive damages at this time but will entertain an appropriate motion and any response Defendant may offer.

## IV.  CONCLUSION

Based on the foregoing, the Court finds that Defendant's negligence caused the breakaway and damage to Plaintiff's barges and that Defendant is liable for damages, including lost profits, totaling $483,381.11.[54]  Of that amount, $212,431.00 has already been paid, leaving a remainder due of $271,400.11, to which will be added prejudgment interest in the amount of $115,565.46, for a total due and owing of **$386,887.13**.  Further, Defendant shall pay Plaintiff's attorneys' fees and costs related to investigating and litigating the issues of bailment and liability, in an amount to be determined.  A final judgment will not be issued in this matter until the resolution of the amount of attorneys' fees and costs to be awarded and the question of any punitive damages award.   An appropriate Order follows.

## V.  EPILOGUE
(with apologies to Henry Mancini, Johnny Mercer, and Audrey Hepburn)

*Mon River's barges drifted free*
*While docked at Industry one day.*
*M/V Ranger put them in danger;*
*Instead of towing, they were going away.*
*They drifted off and down the river.*
*No coal could they deliver, you see.*

---

[54]

The pending July 29, 2009 Oral Motions for directed Verdict and July 31, 2009 Orally Renewed Motions for Directed Verdict will be DENIED, as moot.

*And now, we've reached the trial's end.*
*One must make amends.*
*With luck they'll part as friends,*
*Mon River and Industry.*

                                        <u>*s/Nora Barry Fischer*</u>
                                        Nora Barry Fischer
                                        United States District Judge


CC/ECF:      All counsel of record.